# WORLD WRESTLING FEDERATION ENTERTAINMENT, INC.
## AGENCY AGREEMENT

THIS WORLD WRESTLING FEDERATION ENTERTAINMENT, INC. AGENCY AGREEMENT ("Agreement") is entered into on this eighth (8th) day of September, 1999, and effective the first (1st) day of July, 1999 by and between WORLD FEDERATION ENTERTAINMENT, INC. f/k/a TITAN SPORTS, INC., a Delaware corporation with its principal office at Titan Tower, 1241 East Main Street, Stamford, Connecticut 06902, U.S.A. ("collectively Titan"), and Blue Belt Trading Company, a Kuwait corporation with its principal office at North Nograh Complex, P.O. Box 4958, Hawalli, Kuwait 32060 ("Agent"). For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. <u>Condition Precedent</u>:  Titan and Agent acknowledge and agree that as condition precedent to this Agreement Agent shall make the following payment and accompanying representations to Titan:

    (a)   Agent shall pay Titan the sum of One Hundred Forty Nine Thousand US Dollars (US $149,000.00), representing outstanding royalties due Titan pursuant to a previous home video license agreement entered into between the parties, in accordance with the following schedule:

    (i)   Fifty Thousand US Dollars (US $50,000.00) on or before September 1, 1999;

    (ii)  Fifty Thousand US Dollars (US $50,000.00) on or before October 1, 1999;

    (iii) Forty Nine Thousand US Dollars (US $49,000.00) on or before November 1, 1999;

    (b)   Notwithstanding payment of the foregoing monies, Agent shall, upon execution of this Agreement, release and discharge Titan from any and all prior obligations, debts, lawsuits, claims or other disputes that occurred or may occur in the future between the parties arising out of a series of agency agreements, including without limitation the following:

    (i)   Titan Sports, Inc. Side Letter Agreement dated June 11, 1996, referencing agency commissions on merchandising, publishing, television and live events;

    (ii)  Distribution Exclusive Agency Agreement dated June 11, 1996 relative to merchandising;

    (iii) Live Event Promotion Exclusive Agency Agreement dated June 11, 1996;

    (iv)  Titan Sports, Inc. side Letter Agreement dated June 11, 1996 relative to publishing;

       (v)       Amendment to the exclusive Agency Agreements dated June 12, 1996;

       (vi)       Exclusive Home Video License (Asia) dated September 22, 1997;

       (vii)       Exclusive Home Video License (Arabic speaking countries) dated September 5, 1997;

       (viii)       Letter Amendment dated June 12, 1996, increasing certain international television licensing commissions from 10% to 25%; and

       (ix)       any and all other agreements between Titan and Blue Belt entered into prior to the execution of this Agreement including a partially executed agency agreement dated August 5, 1999 and subsequent Letter Agreement dated August 30, 1999 (all of the foregoing collectively hereinafter referred to as "Prior Agreements").

       (c)       <u>Release Of Known And Unknown Claims</u>. Blue Belt Trading Company, its employees, officers, directors, licensees, successors, parent companies, affiliates, contractors, agents, assigns, heirs and any other person or entity, including without limitation Adnan Ezrique, claiming through any of the foregoing or affiliated in any way therewith the foregoing (hereinafter collectively referred to as "Agent"), hereby release World Federation Entertainment, Inc., Titan, its parent companies, subsidiaries, successors and assigns and its and their respective employees, officers, directors, licensees, representatives and agents ("Releasees") from any and all claims, causes of action, rights, obligations, debts, liabilities, accounts, liens, damages, losses and expenses of every kind and nature whatsoever, whether known or unknown, foreseen or unforeseen, patent or latent, suspected or unsuspected, fixed or contingent, which Agent has or may have against Releasees, arising from, relating to, or based upon any cause, matter or reason whatsoever, including, but not limited to, any and all claims, causes of action, rights, obligations, debts, liabilities, liens, damages, losses and expenses arising from, relating to or in any manner connected with, directly or indirectly, the Prior Agreements. Agent acknowledges that it is aware that it may hereafter discover facts different from or in addition to those it now knows or believes to be true with respect to the claims, causes of action, rights, obligations, debts, liabilities, accounts, liens, damages, losses and expenses herein released, and Agent agrees that the within release shall be and remain in effect in all respects as a complete and general release as to all matters released herein, notwithstanding any such different or additional facts.

       (d)       <u>Covenant Not To Sue</u>. Agent agrees that it will not make, assert, or maintain against Releasees, as defined in Subparagraph 1(c) above, any claim, demand, action, suit or proceeding arising out of or in connection with the matters released in this Agreement. Agent further agrees to defend, indemnify and hold Releasees harmless from and against any claim, demand, right, damage, debt, liability, account, action, cause of action, cost or expense, including attorneys' fees actually paid or incurred (including allocable costs of in-house counsel), arising out of or in connection with the Prior Agreements or the matters released in Subparagraph 1(c) above.

       2.       <u>Definitions</u>. For purposes of this Agreement the following definitions shall apply:

(a) The term "Copyrights" shall mean all copyrights now or hereafter owned by Titan relating to the Events or the Talent.

(b) The term "Events" shall mean the professional wrestling events produced, promoted, and performed by Titan, whether live, via television, or via any other method of dissemination.

(c) The term "Intellectual Property" shall mean the Rights of Publicity, the Trademarks, the Copyrights, and all other proprietary rights relating to the Talent and/or Events.

(d) The term "Licensee" shall mean a party within the Territory that is granted a license after the commencement date of this Agreement related to the use of Publishing Rights, Home Video Rights and/or Live Event Tour Rights.

(e) The term "Publishing Rights" shall mean the right to print, publish, and sell in the Territory, in the Arabic language only, Titan magazines known as "Raw" and "WWF".

(f) The term "Programs" shall mean television programs produced by Titan related to the Intellectual Property.

(g) The term "Home Video Rights" shall mean the right to sell in the Territory, in the Arabic language only, VHS format video devices produced by Titan related to the Intellectual Property, to be distributed for home use only.

(h) The term "Live Event Tour Rights" shall mean the right to promote live tour Events in the Territory.

(i) The term "Rights of Publicity" shall mean the likenesses, physical characteristics, personalities, characters, personas and other distinctive and identifying indicia of the Talent.

(j) The term "Talent" shall mean all individuals who perform in or at the Events, including, but not limited to, the professional wrestlers who perform in the Events.

(k) The term "Territory" shall mean Arabic speaking Middle Eastern countries specifically identified as follows:

>Kuwait, Bahrain, Qatar, United Arab Emirates, Oman, Saudi Arabia, Yemen, Iraq, Syria, Lebanon, Israel, Palestine, Jordan, Egypt, Sudan, Libya, Tunisia, Algeris, Morocco, Jespoti, and Somalia.

(l) The term "Trademarks" shall mean all symbols, designs, styles, emblems, logos, and marks used in connection with the Events, including, but not limited to, the name WORLD WRESTLING FEDERATION, the WWF scratch and scar logo, the mark WORLD WRESTLING FEDERATION SUPERSTARS, and the names, nicknames, characters, personas and other distinctive and identifying indicia of the Talent, but excluding the initials WWF in block letters.

3. **Term of Agreement; Titan Termination Rights.**

(a) **Term of Agreement.** The term of this Agreement ("Term") shall commence on July 1, 1999 and, unless terminated earlier as set forth in the provisions below, end on June 30, 2002.

(b) **Titan Right of Termination Based on Lack of Performance.** In addition to any other rights set forth in this Agreement, Titan shall have the right to terminate this Agreement if Agent fails to generate Gross Revenues, as defined below, in the Territory, in strict avoidance with the Contract Year deadlines and US dollar amounts set forth in the schedule below:

| Contract Year | Gross Revenues |
| --- | --- |
| July 1, 1999 – June 30, 2000 | US $60,000.00 |
| July 1, 2000 – June 30, 2001 | US $60,000.00 |
| July 1, 2001 – June 30, 2002 | US $60,000.00 |

For avoidance of doubt, the term "Gross Revenues" shall mean any and all monies generated within the foregoing specified time periods from the exploitation of the Publication Rights, Live Event Tour Rights and Home Video Rights within the Territory.

(c) **Titan Right of Termination Based on Lack of Involvement of Key Individual.** In addition to any other rights set forth in this Agreement, Titan shall also have the right to terminate this Agreement by providing Agent with written notice of termination if at any time while this Agreement remains in effect Adnan Ezrique ceases to be substantially involved in the day-to-day activities of Agent. Agent shall furthermore immediately notify Titan in writing of such changes. This provision is a material condition to this Agreement, the breach of which shall result in immediate termination of the Agreement.

4. **Scope of Agency and Obligations of Agent.** Subject to the terms and conditions of this Agreement, Titan appoints Agent to act as its agent in the Territory for the following purposes, and Agent accepts such appointment as agent and agrees to use its best efforts in performing the following services ("Services") for Titan in the Territory:

(a) negotiating the terms of license agreements with prospective Licensees relating to Publishing Rights;

(b) promoting Live Events Tour Rights;

(c) negotiating Home Video Rights, including the right to re-edit, transpose, adapt, subtract for and add to and vary Titan home videos provided to Agent;

(d) promoting the Intellectual Property;

(e) assisting Titan in advertising and promoting Events presented by Titan and the Services rendered by Agent on behalf of Titan;

(f) subject to the provisions of Paragraph 8, negotiating the terms of license agreements with prospective Licensees relating to Publishing Rights, Home Video Rights, and Live Event Tour Rights;

(g) servicing all license agreements with Licensees, including, without limitation:

(i) collecting, disbursing, and accounting for royalties and other payments made by Licensees for the benefit of Titan under such agreements and assuring that all Licensees make royalty payments in a timely fashion;

(ii) providing Licensees with such materials relating to the Intellectual Property as they may require in order to make effective use of the Intellectual Property under their agreements;

(iii) assuring that all Licensees use only approved artwork and materials in exploiting the rights granted them under their agreements;

(iv) assuring that all copyright and trademark notice requirements are satisfied by Licensees, in accordance with the terms of their agreements;

(v) assuring that Licensees submit to Titan, for its prior approval, all products and advertising materials which they propose to manufacture, sell, distribute, or use under their agreements;

(vi) otherwise assisting Titan and the Licensees in exploiting the Intellectual Property in the Territory; and

(h) cooperating in any manner whatsoever with Titan in connection with the performance of the Services, including but not limited to the inherent subtasks that exist within such Services.

(i) For the purposes of this Agreement, the term "Rights" may hereinafter collectively refer to Publishing Rights, Home Video Rights, and Live Events Tour Rights, as defined herein, of Agent within the Territory.

5.   Non-Competition. Agent agrees, represents and warrants that during the Term of this Agreement and for one (1) year after the termination or expiration thereof, it shall not perform services or produce any products for or on behalf of World Championship Wrestling, "WCW" and any individuals related thereto, or any subsidiary or affiliate thereof, or for or on behalf of any other wrestling entity owned or controlled by Time Warner, Inc., Turner Broadcasting System, Inc. or any subsidiary or affiliate thereof.

6.   Agent's Compensation; Accountings.

(a) Agent's Compensation. In full consideration of the Services to be performed pursuant to this Agreement, Agent shall be entitled to receive, while this Agreement remains in effect, the following commission on all fees paid to Titan by Licensees with respect to the exercise of the Rights herein:

(i) <u>Publishing Rights</u>. Agent shall be entitled to receive a commission of Twenty Percent (20%) of the net revenues earned by Titan with respect to the publishing of Titan magazines "Raw" and "WWF" in the Arabic language within the Territory;

(ii) <u>Live Event Tour Rights</u>. Agent shall be entitled to receive a commission of Ten Percent (10%) of the net revenues earned by Titan with respect to the promotion and marketing of live Events within the Territory. Notwithstanding the foregoing, the parties agree to negotiate in good faith the terms and conditions of a Live Event Tour Rights agreement for each and every Event tour produced or sponsored by Titan within the Territory; and

(iii) <u>Home Video Rights</u>. Agent shall be entitled to receive a commission with respect to the sale of home videos within the Territory as set forth in Exhibit A attached hereto.

(iv) <u>Exceptions:</u> Notwithstanding anything to the contrary herein, Agent shall not be entitled to commissions on royalties or to receive any fees paid Titan by Licensees outside the Territory. Furthermore, Agent shall not be entitled to any compensation as a result of the sale of merchandise exploiting the Intellectual Property in any manner whatsoever, unless otherwise directed by Titan in writing (in which event the parties shall establish, on a case-by-case basis, a commission to be payable to Agent with respect to such activity).

(b) <u>Accountings and Payment of Amounts Due</u>. Pursuant to its obligations under subparagraph 3(d)(i) of this Agreement, Agent shall collect from Licensees all royalties which are due Titan from such Licensees under their license agreements. Within fourteen (14) calendar days following after the close of each calendar quarter during the Agreement, unless otherwise set forth herein, Agent shall furnish Titan, along with Titan's share of the royalty payment, an accounting showing:

(i) the total of all royalties received by Agent from all Licensees during such calendar month;

(ii) the royalties paid to Agent by each Licensee with respect to such calendar month;

(iii) the commissions due to Agent under this Agreement with respect to Royalties received by Agent for such calendar month; and

(iv) the amount of net royalties payable to Titan with respect to such calendar month.

All amounts set forth in such accounting shall be stated in the local currency or currencies in which Agent receives payment from Licensees, and payment of net royalties shall be made to Titan by Agent in the relevant local currency or currencies (unless Titan provides Agent notice to the contrary) at the time each such accounting is rendered. Copies of all royalty statements received by Agent from Licensees for the calendar month covered by each such accounting shall be furnished to Titan at the time Agent's accounting is rendered. Agent shall use all reasonable efforts to collect amounts due from each Licensee within forty-five (45) days of the close of the calendar quarter as to which amounts are due. Agent shall promptly notify Titan in writing of any royalties due from a particular Licensee for longer than forty-five (45) days from the relevant due date, stating in detail the circumstances of the Licensee's failure to pay the amount due. Titan shall then determine the

appropriate course of action to be taken with respect to the Licensee in regard to such Licensee's default in payment. Agent's commission shall be calculated on the basis of the net royalties collected by Agent from Licensees, that is, the gross royalties due from Licensees less any withholding taxes levied on such payments to Titan by any country of the Territory. Within sixty (60) days after Titan's obtaining a foreign tax credit, if any, on its U.S. income tax return with respect to such withholding taxes withheld, Titan shall pay Agent an amount equal to Agent's proportionate share of such tax credit.

(c)  Expenses. All expenses related to the performance of Agent's Services, the exploitation of the Rights and other obligations hereunder shall be the sole responsibility of Agent and paid for by Agent.

(d)  Adjustments in Amounts Paid. The receipt or acceptance by either party of any accounting or payment made by the other pursuant to this Agreement shall not preclude either party from questioning its correctness at any time. If any errors are discovered in any such accounting or payment, appropriate adjustments shall be made immediately. The party in error shall pay the other interest on a late payment at an annual rate of two percent (2%) over the prevailing prime interest rate in effect in the City of New York, State of New York, on the date on which such payment should have been received.

(e)  Retention of Records; Audits. Agent shall keep full and accurate books of account and copies of all documents and other records relating to this Agreement at Agent's principal office while this Agreement remains in effect and for two (2) years thereafter. Titan, through its duly authorized agents and representatives, shall have the right to examine and make copies of such books, documents, and other records. If any audit of Agent's books and records reveals that Agent has failed properly to account for and pay amounts owed to Titan under this Agreement, and the amount which Agent has failed to properly account for and pay for any monthly accounting period exceeds, by five percent (5%) or more, the amounts actually accounted for and paid to Titan for such period, Agent shall, in addition to paying Titan such past due amounts, reimburse Titan for its direct out-of-pocket expenses incurred in conducting such audit, together with interest on the overdue amount at an annual rate of two percent (2%) over the prevailing prime interest rate in effect in the City of New York, State of New York, on the date on which such overdue amount should have been paid to Titan.

7.  Additional Compensation.

(a)  Home Video License. In addition to the rights granted hereunder to Agent, Agent desires to become a Licensee of Titan with respect to Home Video Rights within the Territory. Upon the terms and conditions set forth in this Agreement, and subject to the terms and conditions of the Home Video License Agreement, which is attached hereto as Appendix "A" and made a part hereof by reference as if more fully set forth at length herein, Titan hereby grants to Agent the exclusive right and license to use Intellectual Property in connection with the manufacture, distribution, sale and advertising of Home Video Rights in the Territory during the Term of this Agreement. Agent acknowledges and agrees that should a conflict or ambiguity arise between any provision in this Agency Agreement and Appendix A, the language in this Agency Agreement shall control.

(b) <u>Television Commissions</u>. In addition to the Rights granted hereunder to Agent, Titan, in return for Agent's efforts and continued loyalty within the Territory, shall pay Agent a Ten Percent (10%) commission on the license fees generated from international television license agreements entered into by Titan and third parties within the Territory.

8. <u>License Agreements; Marketing Plans</u>.

(a) <u>License Agreements</u>. Having negotiated with a prospective Licensee the terms of a license agreement covering Publishing Rights, Home Video Rights, and Live Event Tour Rights, Agent shall forward to Titan a "deal sheet" containing all information requested by Titan to prepare a license agreement with such Licensee. Upon Agent's request, Titan shall supply Agent with a form "deal sheet" for use by Agent. Agent shall not, under any circumstances whatsoever, generate and/or execute license agreements or any amendments or modifications thereto on behalf of Titan for the exploitation of the Rights granted hereunder, without the prior written approval of Titan. License agreements, amendments thereto or any other documents modifying any agreements shall not become effective until executed by Titan as licensor.

(b) <u>Marketing Plans</u>. Within sixty (60) days of the execution of this Agreement, Agent shall provide Titan with a detailed written plan outlining Agent's proposed activities in connection with the promotion and exploitation of the Intellectual Property. Such written plan shall include, on a country-by-country basis, categories of product development nature and amount of advertising and advertising expenditures, proposed methods of operation, royalty projections, and any other information which may be requested by Titan. Such plan shall contain specific information for the period July 1, 1999 through June 30, 2000, and general projections or estimates for the Contract Years July 1, 2000 through June 30, 2001. Agent shall submit similar written plans to Titan on or before June 30, 2000 and June 30, 2001 relative to the marketing plan for each subsequent year of the Agreement. If the parties agree to extend this Agreement beyond June 30, 2002, Agent shall submit similar written plans to Titan on or before June 30 of each year of the extension. In addition to the foregoing, Agent shall provide Titan with monthly business reports, in a form approved by Titan and containing the information specified by Titan.

(c) <u>Agent Acquires No Rights</u>. Agent acknowledges that it acquires no rights under this Agreement to the Intellectual Property except as stated in Paragraph 7 and notwithstanding anything to the contrary herein, all benefit derived from the use of the Intellectual Property shall inure solely to the benefit of Titan. Agent shall have no right to grant any party any rights in the Intellectual Property, without the prior written approval of Titan.

(d) <u>Work For Hire</u>. Agent acknowledges that Titan is the sole and exclusive owner, in perpetuity, of the Intellectual Property and any of the Rights granted hereunder, including any and all patents, copyrights and trademarks that derive out of the exploitation of any of the Rights herein, whether prior to, during, or after the expiration or termination of this Agreement, and/or as it relates to the Services rendered herein. Agent acknowledges that any and all rights, products or materials derived from the Intellectual Property, the Rights and/or the Services rendered herein (the "Work"), shall constitute a "work made for hire" under the copyright laws of the United States or any other applicable law and Titan shall own all and any right, title or interest derived from the results and proceeds of the Work, in perpetuity, including without limitation, any copyright, trademark or patent resulting therefrom, any marketing or promotional rights, whether now known or hereafter discovered, and the right to make, authorize or permit use of any of the foregoing.

F:\USERS\Legal Affairs\Misc\Blue Belt Agency KT 7-27-99 (clean 9-8-99).doc

Agent further acknowledges that the Work is specifically ordered by Titan and the results and proceeds of the Work shall be considered a "work made for hire" for Titan, and, therefore, Titan shall be the owner of the Work. If, under any applicable law, the fact that "work made for hire" is not effective to place full authorship and ownership in Titan, then to the fullest extent allowable and for the full term of protection otherwise accorded to Agent under such applicable law, Agent hereby irrevocably and exclusively grants and assigns to Titan and its successors and assigns, throughout the universe, in perpetuity, all right, title and interest of every kind or nature in and to the Work. Agent hereby assigns and transfers to Titan, all of the foregoing, without reservation, condition or limitation and no right of any kind, nature or description is reserved by Agent.

9. <u>Breach of License Agreements by Licensees; Infringement of Intellectual Property</u>.

(a) <u>Breach of License Agreements by Licensee</u>. If Agent has reason to believe that any Licensee is in material breach of any of the provisions of its license agreement with Titan, Agent shall promptly provide any and all information relating to such breach to Titan, and shall thereafter cooperate, to the fullest extent allowable under the law, with Titan in taking such action against the Licensee, as Titan may deem appropriate under the circumstances.

(b) <u>Infringements</u>. If Agent has reason to believe that any party is infringing upon the Intellectual Property, or otherwise injuring Titan's rights to the Intellectual Property, Agent shall promptly investigate the infringement and provide Titan with any and all information relating to such infringement. Agent shall cooperate, to the fullest extent allowable under the law, with Titan in taking such action against infringers, as Titan may deem appropriate, including but not limited to joining as a party in any legal proceeding which Titan may elect to bring against an infringer. All costs of any such proceeding shall be borne by Titan.

10. <u>Indemnification</u>. Agent agrees to indemnify and hold Titan and its licensees, successors and assigns, parent corporation, subsidiaries and affiliates, and its and their respective officers, directors, employees, advertisers, insurers and representatives harmless from any and all claims, liabilities, judgments, suits, penalties, losses, costs, damages, and expenses resulting therefrom; including but not limited to reasonable attorneys' fees including an allocation for in-house counsel, arising from or by reason of or in connection with (a) any unauthorized use of the Intellectual Property, (b) any agreements or alleged agreements made or entered into by or with Agent to effectuate the terms of this Agreement, including but not limited to, the right to manufacture, distribute, exploit, advertise, sell or utilize of any of the Rights granted hereunder, (c) any breach or alleged breach of the terms, representations and/or warranties made by Agent, its subsidiaries, manufacturers, distributors, or other persons, employees, or agents of any of the foregoing and/or (d) any act under or in violation of this Agreement by Agent, its subsidiaries, manufacturers, distributors, or other persons, employees, agents or representatives of any of the foregoing.

11. <u>Confidentiality</u>. Agent hereby acknowledges and agrees that in further consideration of this Agreement, and continued agreement to use the Services of Agent, Agent shall not, at any time while working with Titan, or after the expiration and/or termination of Agent's relationship with Titan, disclose to any person, organization, or publication, or utilize for the benefit or profit of Agent or for any other person or organization, any sensitive or otherwise confidential business information, idea, proposal, secret, or any proprietary information obtained while with Titan and/or regarding Titan, its employees, agents, officers, directors, subsidiaries,

affiliates, divisions, representatives, agents or assigns (hereinafter "Confidential Information" as further defined below). Confidential Information includes but is not limited to reports, business plans, sales information, cost or pricing information, lists of suppliers or customers, talent lists, story lines, scripts, story boards or ideas, information regarding any contractual relationships maintained by Titan and/or the terms thereof, and/or any and all information regarding Talent engaged by Titan. Confidential Information does not include public information and information legitimately received from a third party. Agent acknowledges and agrees that its agreement to be bound by the terms of this provision is a material condition of Titan's willingness to use and continue to use Agent's services.

12. <u>Breach and Additional Termination Rights</u>.

(a) <u>Breaches</u>. Titan shall have the right at any time, by giving notice in writing to Agent, to terminate this Agreement if Agent commits a breach of any of the provisions of this Agreement; provided, that if the breach in question is one which Agent can effectively remedy, then the notice of termination shall not be effective to terminate this Agreement unless Agent fails within thirty (30) days of the date of such notice to effectively remedy the complained of breach. Notwithstanding the foregoing and anything to the contrary herein, Titan shall have the right to terminate this Agreement immediately if Agent fails to make any payments required pursuant to this Agreement.

(c) <u>Bankruptcy, Insolvency, Etc</u>. In any of the following circumstances Titan shall have the right to immediately terminate this Agreement: (i) if Agent becomes insolvent, or a petition in bankruptcy or for reorganization is filed by or against it, or any insolvency proceedings are instituted by or against it; or (ii) if Agent makes an assignment for the benefit of its creditors, is placed in the hands of a receiver, or liquidates its business.

(d) <u>Effect of Termination</u>. Termination of this Agreement under the provisions of this paragraph 12, or the provisions set forth elsewhere in this Agreement, shall be without prejudice to any rights or claims which Titan may otherwise have against Agent. Upon termination of the Agreement, all amounts then owed to Titan by Agent shall become immediately due and payable. Termination of this Agreement for any reason shall have no effect on any license agreement with a Licensee, except that all dealings which such Licensee as had with Agent under this Agreement shall cease upon termination, and thereafter such Licensee shall deal directly with Titan or such party as Titan may appoint to succeed Agent.

13. <u>Miscellaneous Provisions</u>.

(a) <u>Restriction on Assignments</u>. Without the prior written consent of Titan, (which consent may be withheld in Titan's sole discretion) the Agent shall not, directly or indirectly, assign, sublicense, hypothecate, convey, pledge, encumber or otherwise transfer ("Transfer") any of its rights under this Agreement, except as otherwise expressly provided in this Agreement. Should Agent be a corporation, limited partnership, limited liability company, business trust, general partnership or other business entity, a Transfer which requires the consent of Titan as provided in this Section shall include without limitation (i) any assignment, sale, conveyance, transfer, hypothecation, pledge, encumbrance or other transfer of 50% or more of stock, shares, limited partnership interests, general partnership interests or other equity ownership interests (as appropriate) of Agent within any consecutive 12 month period, (ii) the sale of all or substantially all of the assets of Agent, (iii) any merger, consolidation or reorganization into or with the assignor,

regardless of whether Agent is the surviving entity and (iv) any other action or event which would constitute a transfer of the benefits of this Agreement by operation or force of law. This Agreement shall be binding upon and inure to the benefit of Titan and its successors and assigns, and shall be binding upon Agent, its successors and assigns, but shall inure only to the benefit of Agent. Agent shall not assign or transfer this Agreement, or any interest in or under this Agreement, without Titan's prior written consent.

(b) <u>Parties Not Joint Venturers</u>. Nothing contained in this Agreement shall be construed so as to make the parties partners or joint venturers, or to permit Agent to bind Titan to any agreement.

(c) <u>Modifications of Agreement; Remedies</u>. No waiver or modification of any of the terms of this Agreement shall be valid unless in writing, signed by both parties. Failure by either party to enforce any rights under this Agreement shall not be construed as a waiver of such rights, and a waiver by either party of a default in one or more instances shall not be construed as a continuing waiver or as a waiver in other instances.

(d) <u>Notices</u>. All notices to be given under this Agreement shall be in writing and shall be given at the respective addresses of the parties as set forth on page 1, unless notification of a change of address is given in writing. The date of mailing shall be deemed to be the date the notice is given.

(e) <u>Additional Documents</u>. Titan and Agent shall do all additional things and execute all additional documents that may be necessary or desirable to give full effect to this Agreement.

(f) <u>Headings</u>. The paragraph and section headings of this Agreement are inserted only for convenience and shall not be construed as a part of this Agreement.

(g) <u>Complete and Entire Understanding</u>. Agent and Titan acknowledge that this Agreement constitutes the complete and entire understanding between Agent and Titan and replaces and supercedes any and all agreements, whether oral or written, between the parties including without limitation the Prior Agreements identified herein. No change, modification, waiver or discharge of any or all of the terms and provisions of this Agreement shall be effective unless made in writing and executed by both Agent and Titan. Any and all representations or agreements by any agent or representative of either party to the contrary shall be of no effect.

(h) <u>Governing Law</u>. This Agreement shall be construed according to the laws of the State of Connecticut, U.S.A., regardless of the place or places of its physical execution and performance.

(i) <u>Arbitration</u>. The parties agree that if a claim or controversy should arise concerning this Agreement whether in tort, contract or otherwise, or breach of any obligation arising under this Agreement, or interpretation of this Agreement, such dispute shall be resolved by binding arbitration under the Commercial Arbitration Rules of the American Arbitration Association with the arbitration to be held in Stamford, Connecticut. The parties shall each pay one-half (1/2) of the costs of the arbitrator and the arbitrator shall thereafter award costs and attorneys' fees to the prevailing party. The arbitration award shall be binding and non-appealable, and may be entered as a final judgment in any court having jurisdiction over the award

F:\USERS\Legal Affairs\Misc\Blue Belt Agency KT 7-27-99 (clean 9-8-99).doc

(j) <u>Independent Contractor</u>. Agent understands, acknowledges and agrees that at all times it is an independent contractor, acting in the ordinary course of business, and nothing contained shall make Agent an employee, agent or partner of Titan. Accordingly, Titan shall not have any right or obligation to withhold any monies for any taxes, insurance, social security payments or other contribution or payments for the benefit of Agent, or to provide Agent with any workers' compensation, disability or other similar insurance coverage. Agent has no authority to bind Titan to any contract, agreement or other obligation with any third parties, unless specifically authorized in writing by Titan's President and CEO.

(k) <u>Agent Acknowledgement</u>. The Agent by executing this Agreement acknowledges that it has reviewed and understands all the provisions of this Agreement, including the attached Appendix A "Home Video License Agreement".

(l) <u>Appendices</u>. This Agreement is subject to all the provisions relating to the Home Video License Agreement attached hereto as Appendix "A", and is made a part of this Agreement by reference, as if they were fully set forth at length herein.

(m) <u>Attorney Acknowledgement</u>. Each party has reviewed the terms of this Agreement with their respective attorneys and, as a direct result thereof, has executed this Agreement with the consent and acknowledgement of their attorney.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

WORLD WRESTLING FEDERATION ENTERTAINMENT, INC.
f/k/a TITAN SPORTS, INC.
("Titan")

By: *[signature]*
Linda E. McMahon
President and Chief Executive Officer

Dated: Nov 11, 1999

BLUE BELT TRADING COMPANY

By: *[signature]*
Adnan Ezrique
President

Dated: 9-11-1999

APPENDIX "A"

WORLD WRESTLING FEDERATION
HOME VIDEO LICENSE AGREEMENT

THIS WORLD WRESTLING FEDERATION HOME VIDEO LICENSE AGREEMENT ("Agreement"), dated as of September 8, 1999, and effective as of July 1, 1999, is made and entered into by and between WORLD FEDERATION ENTERTAINMENT, INC. f/k/a TITAN SPORTS, INC., a Delaware corporation with its principal office at Titan Tower, 1241 East Main Street, Stamford, Connecticut 06902 ("Titan"), and BLUE BELT TRADING COMPANY, a Kuwait corporation with its principal office at North Nograh Complex, P.O. Box 4958, Hawalli, Kuwait 32060 ("Licensee"). In consideration of the promise and undertakings set forth below, and for other good and valuable consideration, the receipt and sufficiency of which are hereby established, Titan and Licensee hereby agree as follows:

      1. Definitions. For purposes of this Agreement the following definitions shall apply:

      (a) The term "Advertising Materials" shall mean all advertising and promotional materials and all packaging, wrapping, and labeling materials for the Titles (including, by way of illustration but not limitation, catalogs, trade advertisements, flyers, sales sheets, labels, package inserts, hangtags, and displays) which are produced by or for the Licensee and which make use of the Intellectual Property.

      (b) The term "Copyrights" shall mean all copyrights now or hereafter owned by Titan relating to the Events or the Talent.

      (c) The term "Events" shall mean the professional wrestling events produced, promoted, and performed by Titan, whether live, via television, the Internet or via nay other method of dissemination now known or hereinafter discovered, provided however, the term Events shall not include any comic, cartoon, or animated events, characters, characterizations, designs or visual representations, including without limitation comic books, magazines or portions of magazines, animated television programs or portions of programs, and comic, cartoon or animated internet events, even if such comic, cartoon, or animated events, characters, characterizations, designs or visual representations are subsequently produced, promoted or performed by Titan or otherwise.

      (d) The term "Intellectual Property" shall mean the Rights of Publicity, the Trademarks, the Copyrights, and all other proprietary rights relating to the Events and/or Talent.

      (e) The term "Licensed Products" shall mean the following items: Home Video Distribution in VHS format video devices containing Titan approved Titles, as defined herein, in the Arabic language, to be distributed for home use only.

      (f) The term "Title(s)" shall collectively mean the following items recorded on VHS format video devices in the English language each individual World Wrestling Event recorded on video and licensed to Licensee:

F:\USERS\Legal Affairs\Misc\Blue Belt Agency KT 7-27-99 (clean 9-8-99).doc

(i) The term "PPV Event Titles" shall mean each of the following video recordings of World Wrestling Federation Events in their entirety, distributed initially on a pay-per-view basis: "Royal Rumble", "Wrestlemania", "King of the Ring", "Summer Slam", "Survivor Series" and seven (7) other annual pay-per-view programs produced, promoted and performed by Titan on pay-per-view television, which includes without limitation "In Your House" events.

(ii) The term "Sell Through Titles" shall mean each recording on video of a compilation or combination of World Wrestling Federation Events, Talent, and/or Intellectual Property specifically created, developed and produced by Titan.

(iii) The term "Coliseum Titles" shall mean each recording on video of any and all World Wrestling Federation Events, Talent and/or Intellectual Property released to the general public by Coliseum Video on behalf of Titan, on or before December 31, 1997.

(g) The term "Masters" shall mean recording on tape in VHS format of the Title.

(h) The term "Net Sales Price" shall mean the Licensee's invoiced billing price to its customers or distributors for the Licensed Products, less returns for damaged goods.

(i) The term "Rights of Publicity" shall mean the likenesses, physical characteristics, personalities, characters, and personas and other distinctive indicia of the Talent.

(j) The term "Talent" shall mean all individuals who perform in or at the Events, including, but not limited to, the professional wrestlers who perform in the Events.

(k) The term "Territory" shall mean Arabic speaking Middle Eastern countries specifically identified as follows:

> Kuwait, Bahrain, Qatar, United Arab Emirates, Oman, Saudi Arabia, Yemen, Iraq, Syria, Lebanon, Israel, Palestine, Jordan, Egypt, Sudan, Libya, Tunisia, Algeris, Morocco, Jespoti, Somalia

(l) The term "Trademarks" shall mean all symbols, designs, styles, emblems, logos, and marks used in connection with the Events, including, but not limited to, the name WORLD WRESTLING FEDERATION, the WWF scratch and scar logo, the mark WORLD WRESTLING FEDERATION SUPERSTARS, and the names, nicknames, characters, personas and other distinctive and identifying indicia of the Talent, but excluding the initials WWF in block letters.

2. Grant of License; Channels of Distribution Reserved to Titan.

(a)(i) Grant of License. Subject to paragraph 2(a) (iii) below, Titan grants to the Licensee, upon the terms and conditions set forth in this Agreement, the exclusive right, license and privilege, in the Territory during the term of this Agreement, to manufacture, sell, distribute, reproduce, exploit, advertise or otherwise market the Licensed Products for exhibition on a television set for private home use only. The rights and licenses granted hereunder shall pertain only to the extent specifically set forth herein subparagraph 1(e) Licensed Products. Licensee shall only have the right to distribute the Licensed Products to be used for exhibition on a television set for private home

F:\USERS\Legal Affairs\Misc\Blue Belt Agency KT 7-27-99 (clean 9-8-99).doc

use only. Licensee shall also have the right to appoint agents and/or subagents within the Territory, provided each agent/sub agent is approved in advance by Titan.

(ii) In manufacturing the Licensed Products, Licensee shall reproduce and incorporate the Masters in their entirety in the form delivered by Titan to Licensee with no titles, credits or other material changed, added, omitted or edited. Licensee shall have the right to incorporate in the Licensed Products, preceding and/or following the main and end titles of the Title and trailers thereof, Licensee's name, trademark, logos, and appropriate warning and certification notices. Licensee shall not include any materials of any nature (including but not limited to commercials, advertisements, other programming, etc.) in the Titles, other than the Licensee's name, trademark, or logos as stated herein in any Licensed Product. Licensee shall incorporate in each of the License Products and all packaging, advertising and marketing materials of any nature thereof (a) the name, tradenames, trademarks, service marks and logos of Titan and its designees in such manner as specified and approved by Titan, in its sole discretion, and (b) any and all such copyright notices as specified by Titan.

(iii) The rights granted to Licensee do not include the right to authorize the use of the Licensed Product for viewing (a) in any place of public assembly, whether an admission fee is charged or not, for broadcasting by television, cable, Internet or other method of dissemination now know or hereinafter discovered, whether free or for pay, for theatrical or non-theatrical exhibition, except for promotion of the Licensed Products, or (b) in any language other than Arabic. Licensee shall not make use of or authorize any use of this License or the Licensed Products outside the Territory or distribute or sell the Licensed Products directly or through others to retailers outside the Territory. Licensee is further prohibited from selling or transferring the Licensed Product in any manner to any party or entity within the Territory who the Licensee knows or has reason to know will use or sell said Licensed Product outside of the Territory. Licensee is further prohibited from selling or transferring the Licensed Product in any manner to any party or entity, including but not limited to who the Licensee knows or has reason to know will use said Licensed Product for commercial gain or profit, wholesalers, retailers or street vendors.

(b) <u>Titan's Channels of Distribution</u>.

(i) The rights granted to the Licensee by Titan under subparagraph 2(a) shall not include the right to distribute the Licensed Products through the following Titan channels of distribution: (l) sales at World Wrestling Federation Events; (2) World Wrestling Federation catalog sales; (3) World Wrestling Federation direct mail sales; (4) direct sales via the Internet, television or other electronic media relating now known or hereinafter discovered to the World Wrestling Federation, and (5) World Wrestling Federation vending machine sales.

(ii) For the avoidance of doubt, during the Term of this Agreement, as defined below, Licensee, its distributors, manufacturers, vendors, agents and/or representatives agree not to sell, distribute or otherwise disseminate any of the Titles within a five (5) mile radius of an Event. Licensee agrees to enter into a written agreement with every distributor, manufacturer, vendor, agent or other representative related in any manner to the Titles and as a condition to this Agreement, incorporate into such agreements the limitations specifically set forth in the preceding sentence, for the sole benefit and protection of Titan's rights hereunder. Licensee further agrees to furnish Titan within thirty (30) days of their execution, copies of all agreements with such entities. The failure to comply

with any aspect of this Paragraph is a material breach and Titan shall have the right to immediately terminate this Agreement.

(iii) Licensee agrees to defend, indemnify and hold Titan and its licensees, successors and assigns, parent corporation, subsidiaries and affiliates and its and their respective officers, directors, employees, advertisers, insurers and representatives harmless form any and all liabilities, claims, suits, costs or damages including but not limited to reasonable attorney fees or any appropriate allocation for in house counsel, for any and all liability related in any manner to the seizure of any Licensed Product at an Event within the radius specified in subparagraph (ii) above. This provision is in addition to and in no way limits Section H in the Standard Terms and Conditions attached hereto.

3. Period of Agreement. The period of this Agreement shall commence on July 1, 1999 and end on June 30, 2002, unless terminated earlier pursuant to the terms hereof ("Term"). Each individual year shall hereinafter be referred to as a "Contract Year."

4. Royalties. In consideration for the rights granted to it under this Agreement, the Licensee agrees to pay Titan the following royalties:

(a) (i) Guaranteed Royalty Amount. The Guaranteed Royalty Amount paid to Titan by Agent during the Term shall be ONE HUNDRED EIGHTY THOUSAND US Dollars (US $180,000.00) ("Guaranteed Royalty Amount").

(ii) Guaranteed Royalties. The total of all royalties payable to Titan for each Contract Year set forth below, the Licensee shall pay Titan, on or before the dates stated in the payment schedule below within thirty (30) days after the end of each Contract Year:

| Due Date | Amount Due |
| --- | --- |
| July 1, 2000 | US $60,000.00 |
| July 1, 2001 | US $60,000.00 |
| June 30, 2002 | US $60,000.00 |

5. Non-Competition. The Licensee agrees that it shall not, while this Agreement remains in effect and for one (1) year thereafter, produce any products or provide any services using (a) the name, logos or other trademarks or service marks associated with any professional wrestling organization other than the WORLD WRESTLING FEDERATION ENTERTAINMENT, INC. or its affiliates, and/or (2) the name and/or likeness of any professional wrestler not associated with Titan.

6. Minimum Title Requirement. Licensee agrees that is shall release a minimum of Twelve (12) Titles during each year of this Agreement. Titan and Licensee agree to cooperate and use their mutual best efforts to select all other Titles to be released during Term, which Titles shall be identified in writing signed by both parties prior to any use of said Titles by Licensee.

7. <u>Marketing Plans</u>. Within ninety (90) days of the execution of this Agreement, and on or before each one-year anniversary of the commencement date of this Agreement, the Licensee shall provide Titan with a written marketing plan with respect to the Licensed Products/Titles. Each such marketing plan shall include, on a Licensed Product-by-Licensed Product basis, a marketing timetable, sales projections, channels and methods of distribution, nature and amount of advertising and advertising expenditures, and any other information which Titan may ask the Licensee to include. Each marketing plan shall contain specific information for the one-year period immediately succeeding its submission and general estimates or projections for subsequent periods during which this Agreement remains in effect.

8. <u>Display of Official Tag.</u>

(a) Licensee agrees that it shall undertake to attach to each Title and/or its container an "Officially Licensed WWF Product" tag or label in a form prescribed and/or approved by Titan. In addition, Licensee shall cause its own name to appear on each Title and/or its container. It is acceptable for Licensee's name to appear on a label prescribed and/or approved by Titan.

(b) Licensee agrees to defend, indemnify and hold Titan and its licensee, successors and assigns, parent corporation, subsidiaries and affiliates and its and their respective officers, directors, employees, advertisers, insurers and representatives harmless from any and all liabilities, claims, suits, costs, damages, including but not limited to reasonable attorney fees including an appropriate allocation for in house counsel, for any and all liability related in any manner to the seizure of any Titles, resulting from Licensee's failure to affix the official tag and/or Licensee's name to any Title or its container pursuant to this paragraph. This provision is in addition to and in no way limits Section H in the Standard Terms and Conditions attached hereto.

9. <u>Licensee Acknowledgment</u>. The Licensee by executing this Agreement acknowledges that it has reviewed and understands all provisions of this Agreement, including the attached Standard Terms and Conditions.

10. <u>Standard Terms and Conditions</u>. This Agreement is subject to all of the provisions of the Standard Terms and Conditions as attached hereto and incorporated herein by reference.

11. <u>Attorney Acknowledgement</u>. Each party has reviewed the terms of this Agreement with their respective attorneys and, as a direct result thereof, has executed this Agreement with the consent and acknowledgement of their attorneys.

F:\USERS\Legal Affairs\Misc\Blue Belt Agency KT 7-27-99 (clean 9-8-99).doc

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

WORLD WRESTLING FEDERATION ENTERTAINMENT, INC.
f/k/a TITAN SPORTS, INC.
("Titan")

By: _Linda E McMahon_
Linda E. McMahon
President and Chief Executive Officer

Dated: _Nov 11, 1999_

BLUE BELT TRADING COMPANY
("Licensee")

By: _[signature]_
Adnan Ezrique, President

Date: _9-11-1999_

F:\USERS\Legal Affairs\Misc\Blue Belt Agency KT 7-27-99 (clean 9-8-99).doc