| | |
|---|---|
| NO. X05-CV-03-0193994-S | SUPERIOR COURT |
| WORLD WRESTLING ENTERTAINMENT, INC. | COMPLEX LITIGATION DOCKET FOR THE JUDICIAL DISTRICT OF STAMFORD/ NORWALK AT STAMFORD |
| VS. | |
| JAMES K. BELL, ET AL. | MAY 12, 2004 |

## AFFIDAVIT IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

STATE OF CONNECTICUT    )
                        )   SS:    Norwalk
COUNTY OF FAIRFIELD     )

JAMES K. BELL, having been duly sworn, states:

1. I am a defendant in the above captioned litigation and I make this affidavit in response to the plaintiff's motion for summary judgment.

2. In 1998, as I was facing the conclusion of my divorce and at the same, without realizing it, suffering from the effects of bipolar disease, Lyme disease and sleep apnea, all of which have been diagnosed subsequently, I irrationally thought I was facing financial ruin. At that time, Stanley Shenker told me that he could assist me by sharing the commissions he was receiving from WWE, which he said were more than he ever could have imagined.

3. I did not have, and never have had, a foreign bank account or company. Shenker sent me two checks of $20,000 from Hong Kong. They were a share of a finders fee from a mold sale from Playmates to Jakks. I took no

particular note of the fact that the checks were on a Hong Kong bank. I needed the money to start paying my divorce attorney and the settlement to my wife, who received $20,000 of this sum.

3. Shenker demanded invoices for his records and I provided them.

4. Shenker and Jakks always told me that this money was a finders fee for the figures mold sale from Playmates to Jakks. I have taken and passed two polygraph tests on this very issue.

5. Acclaim was an eight-year-old deal which preceded my involvement with WWE and originally had been brought to WWE by its prior agent, Al Kahn of Leisure Concepts. As part of his agent separation agreement, Leisure Concepts was to continue receiving their 30% commission on the Acclaim license. Later, Leisure Concepts became WCW's licensing agent and it was more than annoying to Vince and Linda McMahon that the licensing agent for their prime competition was making money off their video game license to use against them. Thus, I was instructed by them that they were not to be renewed under any circumstances. This can be confirmed by Paul Eibler, who s now the CEO of Acclaim. Acclaim was given only the courtesy of being allowed to make an offer. None the less, the commission to Shenker actually saved WWE 19% over what would have been paid had Acclaim been renewed. Shenker brought this deal in and I originally rejected it because Jakks was not then in the video gaming business. They came back with THQ as a partner. THQ was the

second or third largest in the industry and had just lost the WCW license. THQ had all the components to do a great game.

6. Moreover, the Acclaim offer was not even close to the size and scope of either of the two other offers from Activision and Jakks/THQ, given that they included stock that was far more valuable than Acclaim, selling for five to ten times Acclaim. I have learned that WWE made millions of dollars selling THQ warrants. Nobody in the video game industry would disagree that this was a great deal for WWE – a $2 million advance against a $20 million guarantee over ten years.

7. While it is true that when potential licensees contacted WWE directly seeking to obtain a WWE intellectual property license, I referred them to Shenker rather than handling the deals in-house, and it is true that Shenker thus received commissions on those deals, my motivation for doing so was not the fact that Shenker was splitting his commissions with me. In fact, because of a "purge" of large numbers of important in-house staff, I had been given a tremendous number of other responsibilities, in addition to licensing, which were financially far more important to WWE than the licensing. I was responsible for Live Event Merchandise, Pay Per View and TV Syndication, all in addition to Licensing. Pay Per View was a priority according to the McMahons. So Shenker did the licensing while I focused on the other businesses. Each one of these other businesses grew in revenue under my management. During this period,

Shenker brought in many licenses and made many contacts and I rejected many of the deals he proposed.

8. Thus, while having Shenker handle licensing deals that might in theory have been handled in-house did cost WWE money, WWE had a net profit on this arrangement because I was freed up to concentrate on areas that were far more lucrative to WWE than the licensing was at that time.

9. I did not improperly or corruptly advance SSAI proposals over other competing offers. I always forwarded for approval to WWE's legal and financial departments the best available proposals and typically accompanied those proposals with the competing proposals so they could make an independent judgment.

10. I did not destroy or shred evidence. I gave Shenker the only hard copies of the documents I had and if they were shredded or destroyed he is the one who did it. I kept electronic copies of the originals on a Toshiba computer which I returned to the I.T. department at WWE.

11. On March 19, 1998, when Shenker and I met with Trinity's president, Robert Goetz, at WWE headquarters in Stamford, I participated only in portions of the meeting. I was required to leave the meeting several times to confer with Vince McMahon, and was not aware at that time of the deal made between Shenker and Goetz for the back end percentage for this so-called exclusive. Eve Covelle, who also was present, can confirm this fact. I do not deny that Shenker

cut me the check. I do not know why he made that payment to me, but I presume it was an error on his part. The deal was assigned to him as a result of Shenker's dramatic improvement of the deal itself, improving the product scope and providing additional funds to WWE. I have been informed by Scott Amann that Mr. Goetz advised Attorney McDevitt that he had received Mr. Amann's approval of this deal with Shenker and for the use of Shenker as his licensing agent. As Mr. Amann advised Attorney McDevitt, Mr. Amann was not yet employed by WWE at that time, so it would appear that Mr. Goetz's testimony in that respect is false.

12. In September of 1996, a wholesale purge took place at WWE's Worldwide Properties Department. It left only myself, some administrative staff, and Shenker on board. Shortly after this purge, a new co-CEO whose name I believe was Neville Meyer, began renegotiating Shenker's deal. I believe that renegotiation involved a lower commission rate and, in exchange, a longer term. This was negotiated entirely by Meyer and the General Counsel, Ed Kaufman. I had nothing to do with this. I believe this was completed in 1997 and not in 1998. Meyer indicated to me that several of the people terminated in the purge had been working on the side with the licensees and receiving a backend. WWE never pursued this.

13. It was common at WWE for many employees to work on the side for licensees – creative Services, writers from Publishing, and others. The WWF

video distributor embezzled $2 million from WWE and was not prosecuted. His deal was not renewed and his work was assigned to me. I was instructed to start a video division, which I did, and in less than 18 months that new division was generating approximately $20 million in revenue with overhead of only approximately $1 million.

14. I do not remember ever swinging prospects to Shenker as alleged. However, I cannot deny having done so because of my continued untreated depression due to bipolar disease, sleep deprivation brought on by severe sleep apnea, central nervous system Lyme disease, and my severe abuse of codeine at that time. At that time, I was ingesting 20 to 30 pills of codeine every day.

15. I was dismissed by WWE for not communicating, and that was caused by the aforesaid medical problems. I would leave the building for hours at a time, and nobody ever noticed or cared. I would not travel and always arranged for somebody else to do the traveling for me, even my superiors. Basil DeVito took many trips for me. I was filled with anxiety about travel. I was afraid to fly and afraid to be in strange cities. This was a terrible time for me. I became a hermit in my personal life.

16. I am told that I was deposed by WWE during the latter half of 2002. I have no memory of this although I am sure I was deposed and did testify. I was seriously abusing codeine at the time and my psychiatric condition had not been diagnosed or treated.

17. The conduct in which I engaged was common at WWE during the time I was there and before I was there. It was tolerated if not encouraged by top management. The official who hired me, Ausbert D'arce, was one such person. No employee known to have engaged in such activity was prosecuted and, to my knowledge, none was ever asked to repay WWE. In my case, although I did receive commissions as I have acknowledged above, WWE actually profited as a result of my efforts and profited more than it would have had I not allocated my time in the way that I did.

*James K. Bell*
JAMES K. BELL

Subscribed and sworn to before me this __12th__ day of May, 2004.

_____
Notary Public

My Commission Exp. Mar. 31, 2009