SUPERIOR COURT: COMPLEX LITIGATION

DOCKET AT STAMFORD

DOCKET NO. X05-CV-00-0180933-S

-----------------------------------

STANLEY SHENKER & ASSOCIATES, INC.,

Plaintiff,

vs.

WORLD WRESTLING FEDERATION/ ENTERTAINMENT, INC.,

Defendant.

-----------------------------------

SUPERIOR COURT: COMPLEX LITIGATION

DOCKET AT STAMFORD

DOCKET NO. X05-CV-03-0193994-S

-----------------------------------

WORLD WRESTLING FEDERATION/ ENTERTAINMENT, INC.,

Plaintiff,

vs.

JAMES K. BELL and BELL LICENSING, LLC, Formerly Known as BELL CONSULTING, LLC,

Defendant.

-----------------------------------

July 22, 2004

11:00 a.m.

VIDEOTAPED DEPOSITION of AUSBERT de ARCE, held at the offices of KIRKPATRICK & LOCKHART, LLP, 599 Lexington Avenue, New York, New York, Pursuant to Subpoena, before Beth Radabaugh, a Notary Public of the State of New York.

A. This was an extension or an appendix to the basic agency agreement. Mr. Ezrique -- Blue Belt Trading were the exclusive agents in the Middle East for Titan Sports, for all of Titan Sports activities, as I recall, including live events and merchandise, TV programming and other things.

Q. So you're saying that this is an amendment to an original agreement?

A. Well, it may not be an amendment, but this is not the full agreement. This is some addition to the original agreement. It wouldn't be on one page is what I'm saying.

Q. Okay. Did you draft and negotiate the original -- you're saying this is not the full agreement.

A. No.

Q. So there should be some other agreement --

A. Yes.

Q. -- that precedes this?

A. Yes.

Q. Did you draft and negotiate that agreement?
A. I negotiated the agreement, yeah.
Q. Do you recall when you negotiated that agreement?
A. Again, shortly after I started with WWF/WWE.
Q. So you think that the original agreement would have been entered into in effect sometime in 1994?
A. Possibly.
Q. This agreement, this distribution agreement, does this reference another agreement, a preceding agreement anywhere?
A. Let me see.
MR. NOLIN: I'm going to object to the entire line of questioning as having nothing to do with this case. I understand --
THE WITNESS: That's what I was wondering also. I mean I don't know why --
MR. NOLIN: Let me finish first.

I understand there's some other lawsuit pending between you and WWE. As far as I know, this entire line of questioning has something to do with that dispute. It has nothing to do with the issues in this case. So I don't understand why we're wasting time on these issues in this case if you're going to take his deposition again in the other case.

MR. KUSELIAS: And I think I've been letting it go just because I want this to move on and the responses have been pretty quick. But I do want to say now after that objection was raised this is exactly what I talked to you about on the phone is this same -- you're inquiring into a line of questioning that is involved in another case. It is clearly not involved in your case.

MS. BARRETTE: No, it clearly is involved in my case and, you know, I'm sorry that Mr. De Arce is involved in

two different matters. Bell's affidavit clearly makes Mr. De Arce's conduct while at WWE relevant to this case.

Peter, you might not agree with me. But, you know, you don't know the case. You haven't read the depositions, which there are some 40 depositions. There are over 800 pleadings, motions and other documents that have been filed in this action. So, you know, for you to say that it's not relevant and that --

MR. KUSELIAS: How many reference Mr. De Arce other than the affidavit?

MS. BARRETTE: The affidavit makes it -- is a very clear reference.

MR. KUSELIAS: The affidavit is a very small part and it doesn't say Mr. De Arce has done anything but know about what happened by Mr. -- what Mr. Bell did, which is set forth in the affidavit.

MS. BARRETTE: The affidavit --

MR. KUSELIAS: There's nothing that relates to Blue Belt Trading or Ezrique Adnan.

MS. BARRETTE: I plan on going through the entire list of license agreements here. So I'm going to continue unless you're going to instruct him not to answer. I mean are you going to instruct him not to answer these questions?

MR. KUSELIAS: I'm going to instruct -- if you're going to continue down the line of questioning about items that are clearly involved in another lawsuit handled by your firm, I'm going to instruct him not to answer.

MS. BARRETTE: Okay.

Q. He Distribution Exclusive Agency agreement that's dated June 11th, Exhibit No. 5, this document doesn't -- does this document reference any other exclusive agreements?

MR. KUSELIAS: Objection.

MS. BARRETTE: Are you going to --

MR. KUSELIAS: I'm instructing him not to answer this entire line of questioning if you're going to persist on this whole row that we just discussed. You can keep asking the questions. It's the same objection.

MS. BARRETTE: Okay.

Q. I'd like you to turn back to Exhibit No. 4 for just a moment. Do you see down across from the letter K there's a company? It looks like it's Kernol Company, SA?

A. Um-hmm.

Q. Do you recognize that name?

A. Um-hmm.

Q. What is that company?

A. It was an agency agreement with a Latin American company.

Q. Does SA after the company name have any particular significance?

A. It means incorporated.

Q. Is that incorporated with respect to Latin American corporations? Is that specific to Latin American corporations?
A. It's specific to non-US corporations.
Q. Okay.
MS. BARRETTE: Would you mark that.
(Exhibit de Arce 6, document entitled Amendment to Settlement Agreement of 10/28/94, is marked for identification as of this date.)
Q. I've handed you what's been marked for identification purposes as de Arce Exhibit No. 6. Do you recognize this document?
A. Yes.
Q. Did you draft this document?
A. I did.
Q. What is it?
A. It's Amendment to Settlement Agreement of October 20th, 1924 -- 1994. October 28th, 1994.
Q. And is this also an agreement that you

drafted between Titan Sports and Blue Belt Trading Company?

MR. KUSELIAS: Objection. This is the same issue as before. Note on the record we're not going to go down this line of questioning at this time.

Q. Is that your signature that appears on both pages of the document?

A. Yes. Well, that's my signature on page two and my initials on page one.

Q. Did you draft this document after you were terminated by WWE?

A. No, I did not.

Q. Id you draft this document --

MR. KUSELIAS: Objection.

Q. -- purporting to bind WWE in exchange for money from Blue Belt Trading?

MR. KUSELIAS: Objection. This is the same line of questioning. You can keep asking the same questions. I'm going to have the same objection.

MS. BARRETTE: So you're going to instruct him not to answer any questions --

MR. KUSELIAS: I have instructed him not to answer.

MS. BARRETTE: And you're going to continue to instruct him not to answer any questions related to Blue Belt Trading? Is that --

MR. KUSELIAS: He's answered questions related to Blue Belt Trading. Now you're getting into the specifics of issues that are involved in our other lawsuit, which have no relevance to your case here. So I am instructing him again not to answer those questions.

MS. BARRETTE: Mr. De Arce's conduct with respect to license agreements that may have condoned or encouraged other employees of WWE to accept bribes and kickbacks is certainly relevant to my case.

MR. KUSELIAS: You can file your motion if you'd like. I'm instructing him at this point not to answer the questions.

MS. BARRETTE: Okay.

Q. When you were drafting license agreements on behalf of WWE, did you consider it your responsibility to obtain the best deal on behalf of the company?

A. Yes.

MR. KUSELIAS: Objection.

Q. Can you tell me how it would benefit WWE to have its license agreements governed by the laws of Arabic speaking countries?

A. Contracts in some countries outside the United States cannot be signed in any other jurisdiction. The Middle East is one of those countries.

Q. So your answer is that because the document can't be signed in another jurisdiction --

A. In Middle Eastern countries they won't accept them. They have to be in the jurisdiction of Middle Eastern law. And there were previous contracts that were signed by the WWF before my time

contracts would be governed by the laws of the courts in all Arabic speaking territories?

MR. KUSELIAS: Only if you know.

MR. NOLIN: Object to relevance.

A. I don't recall, but I think that was the case. Adnan was an existing licensee before I came to the WWF. Adnan and Blue Belt Trading was an existing licensee when I came to the WWF.

Q. I understand. I'm talking about specifically the ones that you negotiated.

A. The -- my negotiations with Adnan were in reference always to his original contract with the WWF, which was in dispute when I arrived at the WWF.

Q. What do you mean it was in dispute?

A. They were in litigation over his rights and over his contract. I was asked by Linda McMahon to settle the situation, and part of that settlement was renegotiating his pre-existing

contract.

Q. Okay. And the documents that I've shown you, No. 5 and No. 6 --

MR. KUSELIAS: Can I have a two-minute break with my witness?

MS. BARRETTE: Sure.

VIDEO OPERATOR: It's 2:57. We're going off the record.

(Recess taken.)

VIDEO OPERATOR: It's 3:06. We're on the record.

MS. BARRETTE: Our position is we have more questions and I have a lot more questions that I think are relevant to our action related to the license agreements and -- that were signed with Blue Belt and that Mr. De Arce negotiated. If it's going to be your position you're going to have a standing objection, then we'll just -- I'm going to stop those questions only based on your standing objection and move the court to bring him back. We're going to preserve our

rights to bring him back if the court determines it's relevant to our action.

MR. KUSELIAS: That's fine. That's exactly what I had said before.

BY MS. BARRETTE:

Q. Mr. De Arce, did you ever direct any business affiliates of WWE to send money to any corporations owned by family members of yours?

A. No.

Q. Did you ever direct any WWE licensees to send any money to any business entities owned by family members of yours?

A. No.

Q. Do you know what it means to be a signatory on a bank account?

A. Yes.

Q. And do you understand that means that you have the power to sign checks on behalf of a bank account if you're a signatory?

A. Um-hmm. Yes.

MR. NOLIN: I object to the form.

Q. Have you ever been a signatory on any bank accounts in any other name other than your own?

A. No.

Q. Have you ever been a signatory on any bank accounts in the name of any foreign corporations?

A. No.

Q. Have you ever been a signatory cn a bank account in Florida?

A. No.

Q. At the very beginning of the deposition I asked you to state your name for the record, or you stated your name as Ausbert de Arce and I had asked you if you had ever gone by any other names and you said no, that you hadn't. Have you ever gone by the name Ausbert de Arce Gonzalez?

A. No.

Q. Have you ever gone by the name A. A. De Arce?

A. No.

CERTIFICATION

STATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK )

I, BETH RADABAUGH, a Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify that the foregoing deposition of AUSBERT de ARCE was taken before me on the 22nd day of July, 2004;

That the said witness was duly sworn before the commencement of his testimony; that the said testimony was taken stenographically by me and then transcribed.

I further certify that I am not related by blood or marriage to any of the parties to this action or interested directly or indirectly in the matter in controversy; nor am I in the employ of any of the counsel in this action.

IN WITNESS WHEREOF, I have hereunto set my hand this 26th day of July, 2004.

BETH RADABAUGH