## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WORLD WRESTLING | § | |
| ENTERTAINMENT, INC., | § | |
| | § | |
| Plaintiff, | § | Civil Action No.3:03CV1568 (DJS) |
| | § | |
| vs. | § | |
| AUSBERT DE ARCE, a/k/a GONZALEZ- | § | |
| DEARCE, A., A. GONZALEZ DE ARCE, | § | |
| AUSBERTO ANGEL GONZALEZ, | § | November 24, 2004 |
| AUSBERT A. GONZALEZ DE ARCE, | § | |
| AUSBERTO GONZALEZ DEARCE; | § | |
| LICENSING WORKS | § | |
| INTERNATIONAL, INC.; and | § | |
| EURODALMER, S.A., | § | |
| | § | **JURY TRIAL DEMANDED** |
| Defendants. | § | |
| | § | |

## SECOND AMENDED COMPLAINT

Plaintiff World Wrestling Entertainment, Inc. ("WWE"), formerly known as World Wrestling Federation Entertainment, Inc. and Titan Sports, Inc., files this Second Amended Complaint against Defendants Ausbert de Arce, a/k/a Gonzalez-Dearce, A., A. Gonzalez de Arce, Ausberto Angel Gonzalez, Ausbert A. Gonzalez de Arce, Ausberto Gonzalez Dearce ("Gonzalez"); Licensing Works International, Inc. ("LWI"); and Eurodalmer S.A. ("Eurodalmer").

## OVERVIEW

1.      Gonzalez, LWI and Eurodalmer have engaged in a multifaceted conspiracy from 1996 to the present with Blue Belt Trading Co. ("Blue Belt") and its principal, Adnan Ahmed Ali Ezrique ("Ezrique")—WWE's former home video licensee in the Middle East—to defraud WWE of its valuable licensing rights, and harm WWE's ongoing business

activities in the Middle East and other parts of Asia.  The Defendants' fraudulent scheme has caused WWE to lose most of its licensing revenues in the Middle East and other parts of Asia from 1996 to the present as well as sustain other damages.  Moreover, Blue Belt and/or Ezirique are currently using fraudulent contracts and a false affidavit executed by Defendant Gonzalez to wrongfully claim they are entitled to **exploit WWE's licensing rights until 2011**.

        2.    As part of this conspiracy, without the knowledge and/or consent of WWE, Defendant Gonzalez has (i) while an employee of WWE, solicited and received payments from Ezrique and/or Blue Belt in exchange for providing Blue Belt with exclusive WWE licensing rights in the Middle East; (ii) after his termination from WWE, falsified and backdated contracts purporting to grant Blue Belt and Ezrique rights not authorized by WWE; (iii) solicited and received payments from Blue Belt and Ezrique through bank accounts in the name of Defendants Eurodalmer and LWI; and (iv) made misrepresentations designed to systematically deceive and coerce Middle Eastern governments and local businesses not to do business with WWE and its duly authorized agents.

        3.    By this action, WWE brings causes of action for violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), conspiracy to violate RICO, forgery, fraud, violation of the Connecticut Unfair Trade Practices Act ("CUPTA"), tortious interference with contractual relations, tortious interference with business expectancies, fraudulent misrepresentation, alter ego, conspiracy, breach of contract and breach of fiduciary duties, seeking both injunctive relief and damages in an amount exceeding $1,000,000.

## PARTIES

        4.    Plaintiff, WWE, is a Delaware corporation having its principal place of business at 1241 East Main Street, Stamford, Connecticut.  WWE is an integrated media and

entertainment company principally engaged in the development, promotion and marketing of television programming, pay-per-view programming and live arena events, and the licensing and sale of branded consumer products.

5.     Defendant, Gonzalez, is a citizen of the State of New York, residing at 604 East 9th Street, New York, New York, 10009.

6.     Defendant, LWI, is a corporation organized under the laws of New York with its principal place of business at 604 East 9th Street, New York, New York, 10009.

7.     Gonzalez is the sole-owner and President of LWI.

8.     Defendant, Eurodalmer, is a corporation formed under the laws of Spain.

9.     Gonzalez is Vice-President of Eurodalmer.

## JURISDICTION

10.     This Court has jurisdiction over the subject matter of these claims and the parties pursuant to 28 U.S.C. § 1331 in that WWE has alleged claims under RICO 18 U.S.C. § 1962, and this Court may exercise supplemental jurisdiction over WWE's state law claims pursuant to 28 U.S.C. § 1367.  In addition and/or in the alternative, this Court has diversity jurisdiction, pursuant to 28 U.S.C. § 1332 because WWE is a citizen of Connecticut, Gonzalez is a citizen of New York, LWI is a citizen of New York, Eurodalmer is a citizen of Spain and the amount in controversy exceeds $75,000.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims alleged herein occurred in this District, and pursuant to 18 U.S.C. § 1965(b).

12.     This suit is related to a previously-filed suit in this Court captioned *World Wrestling Entertainment, Inc. v. Blue Belt Trading Co. and Adnan Ahmed Ali Ezrique,* No. 3:03 CV 0271 (GLG).

## FACTUAL BACKGROUND

### A.     Gonzalez is Introduced to Blue Belt and Ezrique In Connection With His WWE Employment.

13.     A principal component of WWE's business is the licensing of its valuable intellectual property rights to third-parties in connection with, among other things, (i) the distribution of WWE's television and pay-per-view programming; (ii) the production and sale of home videos of WWE programming; and (iii) the production and sale of WWE-branded consumer products in the nature of, *inter alia,* video games, action figures and clothing.

14.     WWE licenses its intellectual property rights to numerous different licensees around the world, separately delineated by specific geographic territory and specific license category.

15.     On or about June 28, 1994, WWE hired Gonzalez to act as WWE's Senior Vice-President of World Wide Properties.  At that time, WWE believed it was hiring an individual named "Ausbert de Arce."  Although he told WWE that his name was Ausbert de Arce, WWE recently learned, that at the time WWE hired him, Gonzalez was using multiple aliases, including Gonzalez-Dearce, A., the name on his driver's license issued from the state of New York.

16.     As WWE's Senior Vice-President of Worldwide Properties, a high-ranking officer of WWE, Gonzalez generally supervised WWE's worldwide licensing and merchandising activities.  As a condition of his employment, on June 29, 1994, Gonzalez signed

a Conflict of Interest and Code of Conduct Agreement (the "Code of Conduct Agreement"), a true and correct copy of which is attached hereto as Tab 1.

17.     Pursuant to the Code of Conduct Agreement, Gonzalez agreed, *inter alia*, that during the course of his employment with WWE, he would not "engage in any activities or have any personal or financial interests which impair, or appear to impair, [his] independence or judgment or otherwise conflict, or appear to conflict with [his] responsibilities to [WWE]."

18.     More specifically, the Code of Conduct Agreement expressly prohibited Gonzalez from, among other things:

a.     accepting fees, commissions or property in connection with any transaction on behalf of WWE;

b.     accepting or offering unauthorized or illegal payments;

c.     using his position directly or indirectly for personal or financial gain;

d.     personally taking advantage of business opportunities which might be of interest to WWE; and

e.     serving as an officer, director, employee, consultant or promoter of for-profit organizations without WWE's prior approval.

19.     At the time Gonzalez was hired, WWE had entered into settlement negotiations with Blue Belt and Ezrique regarding litigation in a United States District Court.  In that case, the court issued a preliminary injunction against Blue Belt and Ezrique precluding them from seeking to enforce alleged WWE contracts, which purported to grant Blue Belt certain WWE licensing rights.

20.     As one of his first assignments for WWE, Gonzalez worked directly on the settlement negotiations.  Specifically, in October of 1994, Gonzalez met with Ezrique in Montreal to discuss the settlement.

21.     Gonzalez eventually helped the parties enter into a settlement agreement dated October 28, 1994 (the "October 1994 Settlement Agreement").  The October 1994 Settlement Agreement paid certain future revenues to Ezrique but forbade Ezrique and Blue Belt from using any WWE licenses or trademarks from that point forward.

22.     After the October 1994 Settlement Agreement, Gonzalez remained in constant contact with Ezrique.

23.     In March 1995, Gonzalez helped convince WWE to agree to an addendum to the October 1994 Settlement Agreement that would permit Blue Belt to distribute WWE home videos in the Middle East as a subagent to WWE's then-existing home video licensee.

**B.    Gonzalez Begins the Conspiracy with Ezrique and/or Blue Belt to Provide Fraudulent WWE Contracts in Exchange for Illegal Kickback Payments.**

24.     In or about 1995, without WWE's knowledge or consent, Gonzalez entered into a conspiracy with Ezrique and/or Blue Belt, pursuant to which, Gonzalez would receive payments from Ezrique and/or Blue Belt, in exchange for providing Blue Belt with exclusive WWE license agreements.

25.     Pursuant to that conspiracy, on or about February 14, 1996, Gonzalez opened two separate bank accounts at the Banco Bilbao Vizcaya Bank, in the name of Eurodalmer: (i) Account No. 2520 01 203; and (ii) Account No. 2530 01 203.  Shortly thereafter, on February 22, 1996, upon information and belief, Gonzalez deposited $15,126, obtained from Ezrique and/or Blue Belt, into Account No. 2530 01 203.

26.     Gonzalez then caused Eurodalmer to wire-transfer $12,125 from Account No. 2530 01 203 to Gonzalez's personal bank account.  On February 29, 1996, Gonzalez closed Account No. 2530 01 203 by transferring $6,001 to the second Eurodalmer account, Account No. 2520 01 203 (the "Eurodalmer Account").

6

27.     Upon information and belief, without WWE's knowledge and/or consent, in exchange for payments from Ezrique and/or Blue Belt, Gonzalez then entered into a number of one-sided agreements with Blue Belt in June 1996, in which he granted Blue Belt extensive WWE licensing and agency rights without requiring Blue Belt to pay any revenues or consideration whatsoever to WWE.  These agreements, including two dated June 11, 1996, granted Blue Belt exclusive rights to the distribution, manufacture and duplication of WWE Merchandising in all Arabic speaking countries and to promoting live wrestling events in all Arabic speaking countries (the contracts are collectively referred to herein as the "June 11, 1996 Exclusive Agreements").

28.     Not long after the execution of the June 11, 1996 Exclusive Agreements, unknown to WWE, Gonzalez also received another payment from Ezrique and/or Blue Belt, in the amount of $15,123, which he deposited into the Eurodalmer Account on September 18, 1996.

**C.      Gonzalez Continues the Conspiracy to Provide Blue Belt and Ezrique Forged and Fraudulent Documents After His Termination of Employment from WWE.**

29.     Very soon thereafter, for reasons unrelated to the allegations contained herein, WWE terminated Gonzalez.  Gonzalez's last day of employment was September 26, 1996.  After that day, Gonzalez had no authority to act on behalf of WWE and/or grant WWE licensing rights to any third-party.

30.     Immediately following his termination, Gonzalez contacted Ezrique about future "projects" related to WWE.

31.     On the very day after his termination, September 27, 1996, Gonzalez sent Ezrique a facsimile regarding Gonzalez's willingness to draft fraudulent, backdated WWE contracts to help Ezrique with his business in the future.

7

32.     In that facsimile, Gonzalez also provided Ezrique with wire-transfer information for the Eurodalmer Account.  With this information, Ezrique could, and did, directly wire-transfer payments to Gonzalez in exchange for the falsified, backdated WWE documents.

33.     On November 22, 1996, as a continuation of their scheme to defraud WWE, Ezrique and/or Blue Belt wire-transferred $14,000 to Gonzalez at the Eurodalmer Account.

34.     Three days later, Gonzalez contacted Ezrique via facsimile and requested that Ezrique determine if there was a mistake in the wire transmission because Ezrique had agreed to wire more than $14,000 pursuant to the scheme.

35.     By facsimile dated December 9, 1996, Gonzalez again contacted Ezrique, this time seeking $20,000 for his fraudulent services.  Gonzalez requested an additional upfront payment for fraudulent contracts he intended to provide to Ezrique and/or Blue Belt in the future.

36.     Gonzalez also contacted Ezrique by facsimiles dated December 16 and 20, 1996, to follow up on Gonzalez's December 9, 1996 request for $20,000 in additional monies.

37.     On or about January 17, 1997, Gonzalez transmitted, via facsimile, a fraudulent draft of an "amendment letter" to Ezrique and Blue Belt.  The draft amendment letter related to an upcoming WWE tour in Kuwait and guaranteed that WWE would pay certain monies to Ezrique should WWE cancel the tour.

38.     The January 17, 1996 facsimile from Gonzalez to Ezrique also requested that Ezrique quickly transfer certain monies to Gonzalez.

39.     That same day, after discussions with Ezrique, Gonzalez transmitted, via facsimile, a second fraudulent draft letter amendment which added the dates for the WWE Kuwait tour to the text of the first fraudulent amendment letter.

40.     Concerned that he did not receive the entire payment for the fraudulent amendment letter, Gonzalez contacted Ezrique by facsimile dated January 20, 1997 to ask if Ezrique had made the "transfer" as they had previously discussed.

41.     In response, on or about January 22, 1997, Ezrique wire-transferred $9,984.00 to Gonzalez at the Eurodalmer Account.

42.     That same day, in furtherance of the conspiracy to defraud WWE and to further conceal the source of payments from Ezrique, Gonzalez opened a bank account in the name of LWI, a company that he had incorporated a few weeks earlier to further the scheme, at the Chase Manhattan Bank in New York (the "LWI Account").  Immediately thereafter, Gonzalez caused Eurodalmer to wire-transfer $2,775 from the Eurodalmer Account to Gonzalez at the LWI Account.

43.     The next day, by facsimile dated January 23, 1997, Gonzalez contacted Ezrique to confirm the receipt of $9,984 and ask when Ezrique would transmit the balance of the $20,000 that Gonzalez expected to receive for providing the fraudulent letter agreement.

44.     On March 31, 1997, Ezrique and/or Blue Belt wire-transferred an additional $9,985 to Gonzalez at the Eurodalmer Account in furtherance of their scheme.

**D.     The Defendants Continued Their Fraudulent Scheme with Ezrique and Blue Belt When WWE Terminated Blue Belt's Contract in 1999.**

45.     Unaware of the fraudulent conduct transpiring between and among Gonzalez, LWI, Eurodalmer, Ezrique and Blue Belt, in or about September 1997, WWE entered into two additional contracts with Blue Belt which provided Blue Belt with the exclusive rights to distribute WWE home videos in the Middle East and Asia (the "September 1997 Agreements").

46.    In or about April 1999, WWE began to have concerns that Ezrique and Blue Belt were withholding payments due and owing to WWE pursuant to the September 1997 Agreements.  As a result, WWE contemplated terminating Blue Belt's then-existing agreements.

47.    Between April 27, 1999, and June 7, 1999, WWE and Blue Belt attempted to resolve WWE's concerns that Blue Belt was withholding payments.

48.    As negotiations stalled, Ezrique suspected that his existing WWE agreements would likely be terminated.  Accordingly, Ezrique and Gonzalez continued their fraudulent scheme.  In order to provide Ezrique and/or Blue Belt with leverage during the negotiations, and to protect Blue Belt in the event WWE terminated Blue Belt's agreements, Gonzalez created two additional fraudulent WWE contracts to make it appear as though WWE actually owed monies to Blue Belt and that Blue Belt had more rights than it actually had. Gonzalez knew or should have known that Ezrique and/or Blue Belt would use the two fraudulent contracts to defraud WWE.

49.    On June 7, 1999, WWE informed Ezrique and Blue Belt that it was terminating Blue Belt's existing contracts pursuant to the specific contractual provisions in those contracts allowing for termination.  Specifically, WWE terminated a June 11, 1996 side Letter Agreement and the September 1997 Agreements.

50.    The very next day, on June 8, 1999, Ezrique and/or Blue Belt transmitted to WWE, by facsimile, the two fraudulent contracts that Gonzalez signed and backdated to make it appear as though Gonzalez executed them while he was employed by WWE.  These documents were:  (i) a fraudulent Amendment to the Exclusive Agreements, dated June 12, 1996 ("June 12, 1996 Amendment to Exclusive Agreements"); and (ii) a fraudulent Amendment to

10

Settlement Agreement of October 28, 1994, dated June 12, 1996 ("June 12, 1996 Amendment to October 1994 Settlement Agreement").

51.     WWE had no record of these fraudulent agreements. However, at that time, WWE had no reason to believe that they had been fraudulently created by Gonzalez pursuant to a conspiracy with Ezrique and Blue Belt.

52.     The June 12, 1996 Amendment to Exclusive Agreements purported to amend the two prior June 11, 1996 Exclusive Agreements.  This fraudulent document granted Ezrique and Blue Belt "the sole exclusive rights and license," in all Arabic speaking countries, to: (i) exploit WWE's rights in home video, including the right to "re-edit, transpose, adapt, subtract from, add to and vary as well as reproduce matches that are staged within and without [Arabic speaking countries]"; (ii) "distribute, lease, advertise and exploit video cassettes and any other reproduction of any [WWE] matches, in any form and by any means [then] in existence or that may [thereafter] come into existence"; (iii) exploit "[WWE's] merchandising"; (iv) exploit "[WWE's] magazines"; (v) "stage, present and promote all matches live in [Arabic speaking countries]"; and (vi) "sell [WWE television] programs to terrestrial standard broadcasters as well as satellite, cable pay and other non-standard broadcasters in [Arabic speaking countries]."

53.     The June 12, 1996 Amendment to October 1994 Settlement Agreement purported to increase to 25% the percentage of gross license fees, and significantly increase the time period WWE was to pay Blue Belt pursuant to the October 24, 1998 Settlement Agreement.

54.     Unknown to WWE at the time, Ezrique and/or Blue Belt paid Gonzalez for these fraudulent contracts.  Among other payments, on or about July 7, 1999, Ezrique and/or Blue Belt wire-transferred $43,602 to Gonzalez at the LWI Account in exchange for the two fraudulent contracts.

**E.      Gonzalez's Fraudulent Contracts Induce WWE to Continue its Flawed Business Relationship with Blue Belt and Ezrique.**

55.     Not knowing about the conspiracy between and among Blue Belt, Ezrique and Gonzalez, and justifiably relying upon the authenticity of the fraudulent contracts executed and backdated by Gonzalez, WWE was fraudulently induced by Blue Belt and/or Ezrique and Gonzalez to enter into a new agency agreement with Blue Belt in September 1999 (the "1999 Agreement," attached hereto at Tab 2).  The 1999 Agreement incorporated some of the terms of the fraudulent June 12, 1996 Amendment to Exclusive Agreements and the fraudulent June 12, 1996 Amendment to Settlement Agreement of October 28, 1994.

56.     The 1999 Agreement was a comprehensive license agreement that was purposely drafted and designed to, and did, supersede any and all prior agreements and/or arrangements between WWE and Blue Belt.  The 1999 Agreement gave Blue Belt the exclusive right to manufacture, distribute and sell WWE home videos, the titles of which were to be approved by WWE.

57.     WWE specifically limited the term of the 1999 Agreement to three years, commencing on July 1, 1999 and expiring on June 30, 2002.  Thus, there would be no further dealings between Blue Belt and WWE after the contract expired.

58.     In or about January 2002, WWE began to suspect that Blue Belt was selling unauthorized bootleg copies of WWE home videos.

59.     In addition to selling unauthorized WWE home videos, Blue Belt was once again withholding payments owed to WWE by failing to pay WWE monies due and owing under the 1999 Agreement.  Specifically, the 1999 Agreement required Blue Belt, among other things, to pay WWE an annual minimum guarantee of $60,000 with respect to Blue Belt's sales of WWE home videos.  Additionally, Blue Belt was responsible for collecting and submitting to

12

WWE any royalties due to WWE as a result of Blue Belt's efforts pursuant to the 1999 Agreement. Blue Belt never paid WWE the annual minimum guarantee and, in fact, paid WWE zero dollars pursuant to the 1999 Agreement.

60.    In an attempt to resolve the financial disputes, on or about February 8, 2002, WWE representatives met with Ezrique in Connecticut.

61.    On March 1, 2002, four months prior to the date Blue Belt's contract was set to expire, WWE informed Ezrique that WWE would not consider new business with Blue Belt until Blue Belt's past financial obligations had been resolved.

62.    Shortly after WWE indicated that it would not consider new business with Blue Belt until such disputes were resolved, Blue Belt and/or Ezrique wire-transferred funds in the amount of $10,000 and $5,000 to Gonzalez at the LWI Account, on March 21, 2002 and April 22, 2002 respectively, in furtherance of the conspiracy.

63.    Soon thereafter, on or before May 20, 2002, Gonzalez provided Ezrique and Blue Belt with another backdated, fraudulent contract. This letter agreement, dated August 12, 1996 (the "August 12, 1996 Amendment," attached hereto at Tab 3), purported to amend the fraudulent June 12, 1996 Amendment to Exclusive Agreements. In particular, the August 12, 1996 Amendment purported to extend Blue Belt's prior Exclusive Agreements with WWE until 2011. The August 12, 1996 Amendment was backdated to August 1996 to make it appear as though Gonzalez had executed the document prior to his termination.

64.    On June 30, 2002, the 1999 Agency Agreement expired. No new contract was entered into between the parties.

65.     Accordingly, by letter dated July 3, 2002, WWE advised Ezrique that Blue Belt no longer had any rights, anywhere in the world, to act as WWE's agent or to sell, license or distribute <u>any</u> WWE products or services.

**F.     Gonzalez's Fraudulent August 12, 1996 Amendment and Corresponding False Affidavit Have Thwarted WWE's Continued Efforts to Obtain Revenue from the Distribution of WWE Home Videos in the Middle East.**

66.     In or around September 2002, WWE entered into a new home video license agreement with Sanjay Video Pte, Ltd. ("Sanjay Video"). That license agreement (the "Sanjay Video License Agreement") granted Sanjay Video the exclusive license to produce and distribute WWE home videos in the Middle East.

67.     Shortly after WWE entered into the license agreement with Sanjay Video, Gonzalez, LWI, Blue Belt and Ezrique continued the scheme to defraud WWE.

68.     By using the August 12, 1996 Amendment that was executed and backdated by Gonzalez, Ezrique began interfering with and obstructing Sanjay Video's ability to distribute and sell WWE home videos in the Middle East, which Sanjay was entitled to do pursuant to the Sanjay Video License Agreement.

69.     The August 12, 1996 Amendment purported to grant Ezrique and Blue Belt "the sole and exclusive rights and license to exploit [WWE's] rights for WWF Home Video, TV Products, live wrestling events, magazines, and WWF merchandise" in "The Far East, The Middle East and all Arabic speaking countries." On the second-page of the fraudulent August 12, 1996 Amendment—curiously blank in the upper half of the page with text beginning in the middle of the page—the backdated contract provided:

> This agreement is irrevocable for the entire period for which the agreements are granted. The duration of this agreement is five years automatically renewed for the similar period [sic]. **Titan agrees that the agreement will also be automatically renewed**

14

**for an additional five years and said agreement will run
through June 12, 2011.**

70.     The August 12, 1996 Amendment is not written in grammatically or
linguistically proper English.  It further contains a clause which provides that it, and the
fraudulent June 12, 1996 Amendment to Exclusive Agreements, would be governed by the laws
and the courts of all Arabic speaking countries.  Moreover, the August 12, 1996 Amendment
contains no consideration on the part of Ezrique and/or Blue Belt for the grant of rights.

71.     The August 12, 1996 Amendment is an unauthorized forgery, executed by
Gonzalez after his termination from WWE, in furtherance of the conspiracy against WWE.

72.     WWE was unaware of the existence of the August 12, 1996 Amendment
until January 2003, when a copy of the fraudulent, backdated contract was sent to WWE from
Sanjay Video who obtained the copy from one of the Ministries of Information in the Middle
East.

73.     Ezrique submitted the fraudulent August 12, 1996 Agreement to multiple
Ministries of Information in the Middle East in order to deceive the Ministries into issuing letters
certifying that Blue Belt was the only company authorized to distribute WWE merchandise in the
Middle East.  Such certification letters prevented, and to this day, prevent Sanjay Video and/or
its distributors from exercising their rights related to WWE's intellectual property in the Middle
East.

74.     To help deceive the Ministries of Information, on or about October 14,
2002, Gonzalez executed a false affidavit, dated October 14, 2002 (the "Gonzalez Affidavit,"
attached hereto at Tab 4) designed to give an air of legitimacy to the August 12, 1996
Amendment.  Under penalty of perjury, Gonzalez attested in the affidavit to the following:

1-   I was the Senior Vice President Worldwide Properties for Titan Sports, Inc. from 1994 to 1997 in [sic] my capacity as S V P [sic] I was fully empowered and therefore authorized to issue exclusive licenses for the rights and distribution of Titan Sports Productions.  I was the only official authorized to issue such exclusive license.

2-   During my term as S.V.P. I entered into an exclusive agency agreement dated June 12, 1996 amended on August 12, 1996 on behalf of Titan Sports Inc. with Adnan Ahmed Ezrique of Blue Belt Company whereby Mr. Ezrique was issued the sole exclusive license to distribute Titan's Productions in all Arabic speaking countries and the Far East.  This license includes the authority to sell, convey, transfer, exploit and assign all or part of such rights to a third party without the consent of Titan Sports, Inc.

3-   Further, such agreement remains in force through June 12, 2011, therefore no present or future official of Titan Sports Inc. can legally issue an exclusive license for Titan Sports products in the Arabic speaking countries and the Far East within the above reference [sic] period (through June 12, 2011).  Accordingly, no party other than Adnan Ezrique can presently have legal claim to an exclusive sole agency or license for Titan Sports Productions in the Arabic speaking countries and the Far East.

75.    The Gonzalez Affidavit also attests that the rights "granted to Mr. Adnan A. Ezrique are irrevocable during the validity of the agreement which extend [sic] up to June 12, 2011 as Mr. Ezrique has purchased these rights and fully paid the agreed upon amount as well as fulfilled all his obligations towards Titan Sports Inc."

76.    Each of the statements of the Gonzalez Affidavit concerning the alleged rights granted to Blue Belt and Ezrique and the alleged effect of the August 12, 1996 Amendment is false.  It is also false that Gonzalez supposedly was "the only official authorized to issue such exclusive license" on behalf of WWE.  It is further false that Ezrique and Blue Belt "fully paid the agreed upon amount" or "fulfilled all of [their] obligations towards [WWE]."  To the contrary, WWE has no record of any payments made by Ezrique and Blue Belt to WWE in or

16

around that time as consideration for the August 12, 1996 Amendment or the fraudulent June 12, 1996 Amendment to Exclusive Agreements.

77.     Armed with the August 12, 1996 Amendment and the false Gonzalez Affidavit, both supplied by Gonzalez, Blue Belt and Ezrique then engaged in the following unlawful conduct designed to prevent WWE's legitimate Middle East distributors from conducting business in the Middle East:

a.  Upon information and belief, on or about October 27, 2002, Ezrique and/or Blue Belt submitted the August 12, 1996 Amendment and the false Gonzalez Affidavit to the Ministry of Information in Kuwait. Based on the fraudulent contract and false Gonzalez Affidavit, the Ministry of Information of Kuwait issued a confirmation letter certifying, incorrectly, that Blue Belt is the only authorized distributor for WWE home videos in the state of Kuwait, until June 12, 2011;

b.  On or about November 9, 2002, Ezrique and Blue Belt submitted false information, based on the August 12, 1996 Amendment and the false Gonzalez Affidavit to the Foreign Ministry of Egypt, Cairo and the Embassy of Jordan in Cairo, alleging that Twalash Arts Publishing, who, upon information and belief was a sub-agent of Blue Belt, was the only authorized distributor of WWE home videos in Egypt. Based on this false information, the Foreign Ministry of Egypt, Cairo and the Embassy of Jordan in Cairo attested to the same;

c.  On or about January 22, 2003, Blue Belt and Ezrique sent legal "Warnings," purportedly drafted by attorney Backer A. Ayyad, representing Blue Belt, to WWE. The "Warnings," which rely on the August 12, 1996 Amendment and the false Gonzalez Affidavit, claimed that Blue Belt is the only authorized distributor of WWE home videos in the Middle East, and that WWE's appointment of Sanjay Video as licensee was in violation of "the law in all countries of the area." Additionally, the "Warnings" stated that Blue Belt and Ezrique had "notified all of the official parties in the area to suspend their dealing's [sic] with your products in order to reach a solution to this dispute";

d.  Through its attorney, Backer A. Ayyad, on or about January 22, 2003, Blue Belt and Ezrique sent a letter and the false Gonzalez Affidavit to a distributor of WWE television programs, located in Dubai, alleging that Blue Belt was the sole right holder for distribution and publishing under the logo WWF-WWE and instructing the Dubai distributor to

17

stop buying and/or broadcasting WWE tapes or Blue Belt would commence legal action;

e.  On or about January 24, 2003, Blue Belt and/ Ezrique sent legal "Warnings," purportedly drafted by attorney Backer A. Ayyad, representing Blue Belt, to Adnan Al Raisi Video. The "Warnings," which rely on the August 12, 1996 Amendment and the false Gonzalez Affidavit, claimed that Blue Belt is the only authorized distributor of WWE home videos in the Middle East, and that WWE's appointment of Sanjay Video as licensee was in violation of "the law in all countries of the area." Additionally, the "Warnings" stated that Blue Belt and Ezrique had "notified all of the official parties in the area to suspend their dealing's [sic] with your products in order to reach a solution to this dispute";

f.  On or about April 21, 2003, Blue Belt and Ezrique sent a letter, purportedly drafted by attorney Backer A. Ayyad, representing Blue Belt, to Adnan Al Raisi Video, a distributor hired by Sanjay Video to distribute WWE home videos in the Middle East, specifically Dubai. The letter, which relied on the August 12, 1996 Amendment and the false Gonzalez Affidavit, claimed that Blue Belt is the only authorized distributor of WWE home videos in the Middle East, and demanded that Adnan Al Raisi Video immediately cease distribution of WWE videos and pay Blue Belt $60,000.00, or Blue Belt would institute legal proceedings;

g.  On or about May 23, 2003, Ezrique and/or Blue Belt sent, through new attorneys, Middle Eastern Global Advocates and Legal Consultants, new "Warnings" to WWE. The new "Warnings also rely on the August 12, 1996 Amendment and the false Gonzalez Affidavit, and claim that Blue Belt is the only authorized distributor of WWE home videos in the Middle East, and that WWE's appointment of Sanjay Video as licensee was in violation of provisions of the Commercial and Brokers Law. The new "Warnings" also specifically referred to the false Gonzalez Affidavit as confirmation of Blue Belt's alleged rights against WWE;

h.  Upon information and belief, Blue Belt and Ezrique have sent copies of confirmation letters that were fraudulently obtained from Ministries of Information to Adnan Al Raisi Video and to video retailers throughout the Middle East. As a result, those distributors and retailers have refused to purchase authorized WWE home videos from Sanjay Video and Adnan Al Raisi Video, and have instead purchased unauthorized, pirated videos from Blue Belt.

78.     Because of the Defendants', Blue Belt's and Ezrique's unlawful activities, WWE's business partners in the Middle East have been completely thwarted in their efforts to perform their obligations under their agreements with WWE and to distribute and sell WWE home videos in the Middle East.

79.     Among other things, due to its inability to distribute WWE videos in the Middle East and the legal threats from Blue Belt and Ezrique based upon Gonzalez's fraudulent August 12, 1996 Amendment and false Gonzalez Affidavit, Sanjay Video was forced to terminate its distribution agreement with Adnan Al Raisi Video because it had not collected any revenues.

80.     As a result of the Defendants' unlawful conduct, WWE has been injured and will continue to be injured in the future, as a result of: (i) lost revenues from the sale of WWE home videos in the Middle East; (ii) loss of various third-party business relationships; (iii) substantial litigation expenses necessitated to attempt to enforce WWE's legal rights; and (iv) injury to its business, reputation and goodwill.

81.     Upon information and belief, Gonzalez, LWI, Eurodalmer, Ezrique and Blue Belt will continue this pattern and scheme of fraudulent activities in the future which will cause further imminent harm to WWE if an injunction is not granted in this matter.

**G.      Gonzalez Presently Continues to Conceal the Fraudulent Scheme.**

82.     In or around April 2004, Gonzalez hired the law firm of Robinson & Cole LLP to open a default judgment in this case.   Soon thereafter, on May 21, 2004, Gonzalez received a wire-transfer in the amount of $2,500, through the LWI Account from Blue Belt's and/or Ezrique's account at the Jordan National Bank.

83.     Two months later, Gonzalez appeared to give deposition testimony in the matter of *Stanley Shenker & Associates, Inc. v WWE*.  Gonzalez had been subpoenaed in the Shenker Litigation because James K. Bell, WWE's former Senior Vice-President of Merchandising and Licensing, specifically identified Gonzalez in an affidavit as an officer of WWE who condoned and encouraged kickback and illegal payments.

84.     During his deposition, in order to conceal the ongoing conspiracy between and among Gonzalez, LWI, Eurodalmer, Blue Belt and Ezrique, Gonzalez committed serial perjury throughout the deposition in response to questions regarding, among other things, his relationship with Ezrique and/or Blue Belt.

85.     Specifically, Gonzalez lied under oath when he testified to, among other things, the following: (i) that after Gonzalez's termination in 1996 he had no communications with Ezrique; (ii) that Ezrique never sent Gonzalez any money for any reason after Gonzalez left WWE; (iii) that after he was terminated, Gonzalez never solicited money from Ezrique; (iv) that Gonzalez never had any discussions with Ezrique about the WWE Kuwait tour that occurred in 1997; (v) that Gonzalez never set up a bank account for a United States company; (vi) that Gonzalez never organized or set up a company in the United States where he was an owner; and (vii) that he was never a signatory on a bank account in the name of a foreign corporation or on any bank accounts located in Florida.

86.     In addition to committing serial perjury during his July 22, 2004 deposition, Gonzalez also provided false interrogatory responses in order to corruptly influence the due administration of justice in this lawsuit by further concealing the conspiracy between and among Gonzalez, LWI, Eurodalmer, Ezrique and Blue Belt.  Gonzalez gave false sworn statements to this Court in his responses to WWE's First Set of Interrogatories, including, *inter*

*alia,* that he supposedly (i) did not "seek or receive any payments from Blue Belt and/or Ezrique;" (ii) did not receive any payments from Blue Belt and/or Ezrique; and (iii) did not sign documents purporting to give Blue Belt and/or Ezrique rights from WWE after his termination by WWE.

## FIRST CLAIM FOR RELIEF

### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1962(c)
### (Against All Defendants)

87.    The foregoing allegations are incorporated herein by reference and reasserted as though fully set forth at length.

### RICO Persons

88.    Gonzalez is a "person" within the meaning of 18 U.S.C. § 1961(3).

89.    Ezrique is a "person" within the meaning of 18 U.S.C. § 1961(3).

90.    Blue Belt is a "person" within the meaning of 18 U.S.C. § 1961(3).

91.    Eurodalmer is a "person" within the meaning of 18 U.S.C. § 1961(3).

92.    LWI is a "person" within the meaning of 18 U.S.C. § 1961(3).

### RICO Enterprise

93.    For the purpose of 18 U.S.C. § 1962(c), Gonzalez, Eurodalmer, LWI, Ezrique and/or Blue Belt, acting in concert, comprised an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) through a pattern of racketeering activity as set forth herein for the purpose of conducting the unlawful activities described herein.

94.    In the alternative, for the purpose of 18 U.S.C. § 1962(c), Gonzalez and Ezrique operated and directed Blue Belt as an "enterprise" within the meaning of 18 U.S.C. §

1961(4) through a pattern of racketeering activity as set forth herein for the purpose of conducting the unlawful activities described herein.

95.     For the purpose of 18 U.S.C. § 1962(c), Gonzalez had authority within the enterprise or enterprises described above and/or conducted or directed the unlawful conduct set forth herein through the enterprise or enterprises described above.  In fact, as stated in detail above, Gonzalez directed Ezrique and Blue Belt to wire-transfer monies to both Eurodalmer's and LWI's bank accounts in exchange for Gonzalez executing backdated and fraudulent documents. Gonzalez also directed Eurodalmer to wire-transfer monies obtained from Ezrique and/or Blue Belt to the LWI Account.

**Effect on Interstate Commerce**

96.     The association-in-fact enterprise of Gonzalez, Eurodalmer, LWI, Ezrique and Blue Belt is an entity that engages in and affects interstate commerce by maintaining contacts and conducting economic and other activities throughout the United States and around the world.

97.     LWI is an entity that engages in and affects interstate commerce by maintaining contacts and conducting economic and other activities throughout the United States and around the world.

98.     Eurodalmer is an entity that engages in and affects interstate commerce by maintaining contacts and conducting economic and other activities throughout the United States and around the world.

**Predicate Acts of Racketeering Activity**

99.     The Defendants conducted, engaged in and/or participated in a pattern of predicate acts through the enterprise or enterprises described above, including the commission of

22

numerous violations of the Federal Mail Fraud Statute, 18 U.S.C § 1341; the Federal Wire Fraud

Statute, 18 U.S.C. 1343; the Federal Money Laundering Statutes, 18 U.S.C. §§ 1956 and 1957;

the National Stolen Property Act, 18 U.S.C. §§ 2318 and 2320; the Federal Obstruction of

Justice Statute, 18 U.S.C. § 1503; and The Travel Act, 18 U.S.C. § 1952.  Such violations are

"predicate acts" under 18 U.S.C. § 1961(1)(B).

      100.    Specifically, the Defendants' predicate acts include, but are not limited to,

the following:

    a.    In furtherance of a scheme or artifice to defraud, and with specific
intent to defraud, the Defendants knowingly used or caused to be used
the mails or wire communications in violation of 18 U.S.C. § 1341
and/or 18 U.S.C. § 1343, to defraud WWE of its valuable licensing
rights by soliciting and/or receiving payments in exchange for creating
and providing fraudulent contracts purporting to grant WWE licensing
rights to Ezrique and Blue Belt—rights which Gonzalez was not
legally able to grant.  The Defendants' specific acts of mail and/or
wire fraud include at least the following:

        (i)    In furtherance of a scheme to defraud, and with specific
intent to defraud, on September 27, 1997, Gonzalez
transmitted by facsimile bank account information for an
account in the name of Eurodalmer SA on which Gonzalez
was a signatory, located at the Banco Bilbao Vizcaya in
Miami to Ezrique and/or Blue Belt;

        (ii)    In furtherance of a scheme to defraud, and with specific intent to
defraud, on November 22, 1996, Ezrique and/or Blue Belt wire-
transferred $14,000 to Gonzalez at the Eurodalmer Account,
located at the Banco Bilbao Vizcaya Bank;

        (iii)    In furtherance of a scheme to defraud, and with specific intent to
defraud, on November 25, 1996, Gonzalez contacted Ezrique
and/or Blue Belt via facsimile to request that Ezrique check to see
if there was a mistake in the amount of the November 22, 1996
wire-transfer as Gonzalez was expecting more than $14,000;

        (iv)    In furtherance of a scheme to defraud, and with specific intent to
defraud, on December 9, 1996, Gonzalez contacted Ezrique via
facsimile requesting $20,000, which was an upfront payment for

fraudulent contracts and documents which Gonzalez intended to provide to Ezrique and/or Blue Belt in the future;

(v)     In furtherance of a scheme to defraud, and with specific intent to defraud, on December 16, 1996, Gonzalez contacted Ezrique via facsimile to follow up on his initial request for $20,000;

(vi)    In furtherance of a scheme to defraud, and with specific intent to defraud, on December 20, 1996, Gonzalez contacted Ezrique via facsimile to follow up on his initial request for $20,000;

(vii)   In furtherance of a scheme to defraud, and with specific intent to defraud, on January 17, 1997, Gonzalez transmitted, via facsimile, a draft amendment letter purporting to provide guarantees for Ezrique and Blue Belt on behalf of WWE with respect to an upcoming WWE tour in Kuwait;

(viii)  In furtherance of a scheme to defraud, and with specific intent to defraud, on January 17, 1997, Gonzalez transmitted, via facsimile, a revised draft amendment letter purporting to provide guarantees for Ezrique and Blue Belt on behalf of WWE with respect to an upcoming WWE tour in Kuwait;

(ix)    In furtherance of a scheme to defraud, and with specific intent to defraud, on January 20, 1997, Gonzalez contacted Ezrique via facsimile and asked if Ezrique had made the transfer as they "had previously discussed";

(x)     In furtherance of a scheme to defraud, and with specific intent to defraud, on or about January 22, 1997, Ezrique and/or Blue Belt wire-transferred $9,984 to Gonzalez through the Eurodalmer Account;

(xi)    In furtherance of a scheme to defraud, and with specific intent to defraud, on January 23, 1997 Eurodalmer wire-transferred $2,775 of monies obtained from Ezrique to Gonzalez at the LWI Account, located at the Chase Manhattan Bank

(xii)   In furtherance of a scheme to defraud, and with specific intent to defraud, on January 23, 1997, Gonzalez contacted Ezrique, via facsimile, to inquire as to when Gonzalez could expect to receive the balance of the $20,000 that Gonzalez expected to receive in exchange for providing the fraudulent amendment letter;

(xiii)   In furtherance of a scheme to defraud, and with specific intent to defraud, on or about March 31, 1997, Ezrique and/or Blue Belt wire-transferred $9,985 to Gonzalez through the Eurodalmer Account;

(xiv)   As a reasonably foreseeable result of the Defendants' fraudulent scheme, on June 8, 1999, Ezrique and/or Blue Belt transmitted, via facsimile, to WWE's legal department, two backdated fraudulent contracts created by Gonzalez: (i) the June 12, 1996 Amendment to Exclusive Agreements; and (ii) the June 12, 1996 Amendment to Settlement Agreement of October 28, 1994;

(xv)   In furtherance of a scheme to defraud, and with specific intent to defraud, on March 21, 2002, Ezrique and/or Blue Belt wire-transferred $10,000 to Gonzalez through the LWI Account;

(xvi)   In furtherance of a scheme to defraud, and with specific intent to defraud, on April 22, 2002, Ezrique and/or Blue Belt wire-transferred $5,000 to Gonzalez through the LWI Account;

(xvii)   In furtherance of a scheme to defraud, and with specific intent to defraud, on or about May 20, 2002, Gonzalez transmitted via mail or facsimile the backdated, fraudulent August 12, 1996 Amendment to Ezrique and/or Blue Belt;

(xviii)   In furtherance of a scheme to defraud, and with specific intent to defraud, on or about October 14, 2002, Gonzalez transmitted via mail or facsimile the false Gonzalez Affidavit to Ezrique and/or Blue Belt;

(xix)   As a reasonably foreseeable result of the Defendants' fraudulent scheme, on January 23, 2003, Ezrique and/or Blue Belt transmitted, via facsimile, legal "Warnings" which relied on the backdated August 12, 1996 Amendment and the false Gonzalez Affidavit, threatening WWE with legal action as a result of WWE's legitimate contractual relationship with Sanjay Video;

(xx)   As a reasonably foreseeable result of the Defendants' fraudulent scheme, on January 23, 2003, Transworld Television transmitted, via facsimile, to WWE, copies of the following documents Transworld received from one of its distributors in Dubai: (i) a letter from Blue Belt's attorney, Backer A. Ayyad, which claimed that Blue Belt was the WWE "right holder" in the Middle East and threatened legal action if Transworld's distributor continued to distribute WWE programs in the Middle East; and (ii) a copy of Gonzalez's fraudulent Affidavit, which was attached to the Ayyad letter;

(xxi)   As a reasonably foreseeable result of the Defendants' fraudulent scheme, on January 24, 2003, Blue Belt transmitted to Adnan Al Raisi Video, via facsimile, legal "Warnings" which relied on the backdated August 12, 1996 Amendment and the false Gonzalez Affidavit.  The "Warnings" warned Al Raisi that Blue Belt was the sole exclusive agent for the distribution of WWE home videos in the Middle East;

(xxii)  As a reasonably foreseeable result of the Defendants' fraudulent scheme, on April 21, 2003, Blue Belt and Ezrique, through their attorney, Ayyad, mailed a letter to Adnan Al Raisi Video, demanding that Al Raisi stop distributing WWE home videos and remit $60,000 to Blue Belt, or face legal action from Blue Belt;

(xxiii) As a reasonably foreseeable result of the Defendants' fraudulent scheme, on or about May 23, 2003, Ezrique and/or Blue Belt, through their new attorneys, Middle Eastern Global Advocates and Legal Consultants, mailed to WWE new "Warnings" which also relied on the August 12, 1996 Amendment and the false Gonzalez Affidavit.  The new "Warnings" claimed that Blue Belt was the only authorized distributor of WWE home videos in the Middle East, and that WWE's appointment of Sanjay Video as a licensee was in violation of the provisions of the Commercial and Brokers Law;

(xxiv)  In furtherance of a scheme to defraud, and with specific intent to defraud, on May 21, 2004, Ezrique and/or Blue Belt wire-transferred $2,500 to Gonzalez through the LWI Account;

(xxv)   As a reasonably foreseeable result of the Defendants' fraudulent scheme, on August 27, 2004, Gonzalez's attorney, Jason Kuselias, mailed to WWE's counsel Gonzalez's responses to WWE's First Set of Interrogatories.  Gonzalez gave false sworn statements to this Court in his responses to WWE's First Set of Interrogatories, including, *inter alia,* that he supposedly (i) did not "seek or receive any payments from Blue Belt and/or Ezrique;" (ii) did not receive any payments from Blue Belt and/or Ezrique; and (iii) did not sign documents purporting to give Blue Belt and/or Ezrique rights from WWE after his termination by WWE.  Such false sworn statements were transmitted or facilitated by mail and Gonzalez knew or should have known such false sworn statements would be transmitted or facilitated by mail.

b.   In violation of the Federal Money Laundering Statutes, 18 U.S.C. §§ 1956 and 1957, the Defendants' solicitation and receipt of payments in exchange for Gonzalez providing fraudulent, backdated contracts to Ezrique and/or Blue Belt, involved proceeds of mail and wire fraud,

enumerated unlawful activities under 18 U.S.C. § 1956, and were designed to conceal the nature and source of such unlawful activity. In addition, or in the alternative, the Defendants' receipt of unlawful payments involved the deposit, withdrawal, transfer or exchange of funds to a financial institution of a value in excess of $10,000 and represented the proceeds of mail and/or wire fraud, enumerated unlawful activities under 18 U.S.C. § 1957. The Defendants' specific acts of money laundering in violation of 18 U.S.C. §§ 1956 and 1957 include at least the following:

(i)     In furtherance of a scheme to defraud, and with specific intent to defraud, on or about November 22, 1996, Ezrique and/or Blue Belt wire-transferred $14,000 to Gonzalez at the Eurodalmer Account, located at the Banco Bilbao Vizcaya Bank;

(ii)    In furtherance of a scheme to defraud, and with specific intent to defraud, on January 22, 1997, Ezrique and/or Blue Belt wire-transferred $9,984 to Gonzalez through the Eurodalmer Account;

(iii)   In furtherance of a scheme to defraud, and with specific intent to defraud, on January 23, 1997, Eurodalmer wire-transferred $2,775 to Gonzalez at the LWI Account;

(iv)    In furtherance of a scheme to defraud, and with specific intent to defraud, on March 31, 1997, Ezrique and/or Blue Belt wire-transferred $9,985 to Gonzalez through the Eurodalmer Account;

(v)     In furtherance of a scheme to defraud, and with specific intent to defraud, on March 21, 2002, Ezrique and/or Blue Belt wire-transferred $10,000 to Gonzalez through the LWI Account;

(vi)    In furtherance of a scheme to defraud, and with specific intent to defraud, on April 22, 2002, Ezrique and/or Blue Belt wire-transferred $5,000 to Gonzalez through the LWI Account; and

(vii)   In furtherance of a scheme to defraud, and with specific intent to defraud, on May 21, 2004, Ezrique and/or Blue Belt wire-transferred $2,500 to Gonzalez through the LWI Account.

27

c.   Aware of the pending judicial proceeding between WWE and Gonzalez, in violation of 18 U.S.C. § 1503, Gonzalez endeavored to corruptly influence the due administration of justice by providing patently false responses to WWE's First Set of Interrogatories. Specifically, Gonzalez gave false sworn statements to this Court, including, *inter alia,* that he supposedly (i) did not "seek or receive any payments from Blue Belt and/or Ezrique;" (ii) did not receive any payments from Blue Belt and/or Ezrique; and (iii) did not sign documents purporting to give Blue Belt and/or Ezrique rights from WWE after his termination by WWE.

d.   Gonzalez's creation and/or execution of forged and/or falsified contracts purporting to grant Ezrique and Blue Belt WWE licensing rights, combined with Gonzalez's false Affidavit, which was intended to deceive third-parties as to the authenticity of the fraudulent contracts, materially contributed to, facilitated and enabled Ezrique and/or Blue Belt's piracy and unauthorized production, sale and trafficking of counterfeit WWE home video products in violation of The National Stolen Property Act, 18 U.S.C. § 2318 and 18 U.S.C. § 2320.

e.   In violation of the Federal Travel Act, 18 U.S.C. § 1952, the Defendants' scheme to defraud WWE of its valuable licensing rights by providing backdated fraudulent contracts to Ezrique and/or Blue Belt, in exchange for unlawful payments—payments which were designed to conceal the true nature and source of the payments, involved the unlawful use of the mail or a facility of interstate commerce with the intent to distribute the proceeds of money laundering—enumerated unlawful acts under 18 U.S.C. § 1952. Thereafter, the Defendants committed acts in furtherance of the scheme, including, but not limited to, soliciting and receiving payments from Ezrique and/or Blue Belt, creating the false Gonzalez Affidavit and submitting false interrogatory responses. Each of the specific acts identified above in violation of the Federal Mail and Wire Fraud Statutes, 18 U.S.C. §§ 1341 & 1343; the Federal Money Laundering Statutes, 18 U.S.C. §§ 1956 and 1957, and the Nation Stolen Property Act, 18 U.S.C. §§ 2318 and 2320, also constitute separate violations of the Federal Travel Act, and therefore, such allegations are incorporated herein by reference and reasserted as though fully set forth at length.

**Pattern of Racketeering Activity**

101.   By knowingly and repeatedly committing the above criminal acts in

furtherance and for the purpose of executing a fraudulent scheme to harm WWE's business, the

Defendants have committed numerous violations of the Federal Mail Fraud Statute, 18 U.S.C. §
1341, the Federal Wire Fraud Statute, 18 U.S.C. § 1343, the Federal Money Laundering Statutes,
18 U.S.C. §§ 1956 and 1957, the Federal Obstruction of Justice Statute, 18 U.S.C. § 1503, The
National Stolen Property Act, 18 U.S.C. §§ 2318 and 2320, and The Travel Act, 18 U.S.C. §
1952.  Such violations are "predicate acts" under 18 U.S.C. § 1961(1)(B).

102.    The Defendants knowingly and repeatedly committed the above criminal
acts in furtherance of and for the purpose of executing a fraudulent scheme to harm WWE's
business.

103.    The predicate acts described herein were related to one another as part of a
common scheme or plan.

104.    The unlawful conduct described herein constitutes a continuous pattern of
racketeering activity.  Such unlawful conduct, which began in or around 1996, continues through
this date and will likely continue in the future.

**Injury to WWE**

105.    As a direct and proximate result of the Defendants' violation of 18 U.S.C.
§ 1962(c) as described herein, WWE has been injured, including, *inter alia,* (i) loss of control
over its valuable licensing rights; (ii) lost revenues from the sale of WWE home videos in the
Middle East; (iii) loss of various third-party business relationships; (iv) substantial litigation
expenses necessitated to attempt to enforce WWE's legal rights; and (v) injury to its business,
reputation and goodwill.

## SECOND CLAIM FOR RELIEF

## CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(d)
### (Against All Defendants)

106.    Each of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

107.    The Defendants, along with Ezrique and Blue Belt, formed a conspiracy for the purpose of achieving and profiting from the racketeering activities described herein in violation of 18 U.S.C. § 1962(c).

108.    The Defendants engaged in and directed one or more overt acts in furtherance of their conspiracy.

109.    The Defendants' conspiracy substantially affected interstate commerce as: (i) much of the conduct that formed the overt acts of the conspiracy involved interstate commerce; and (ii) the damage caused by the conspiracy has harmed a corporation that itself substantially affects interstate commerce.

110.    As a direct and proximate result of the conspiracy in violation of 18 U.S.C. § 1962(d) as described herein, WWE has been injured, including, *inter alia,* (i) loss of control over its valuable licensing rights; (ii) lost revenues from the sale of WWE home videos in the Middle East; (iii) loss of various third party business relationships; (iv) substantial litigation expenses necessitated to attempt to enforce WWE's legal rights; and (v) injury to its business, reputation and goodwill.

## THIRD CLAIM FOR RELIEF

### FORGERY
**(under common law and under Conn. Gen. Stat. § 52-565)**
**(Against Gonzalez)**

111.    Each of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

112.    Gonzalez, with the intent to deceive or defraud, fraudulently made, materially altered and/or materially added to WWE's license agreements with Blue Belt and Ezrique, including, but not limited to:  (i) the fraudulent June 12, 1996 Amendment to Exclusive Agreements; (ii) the fraudulent June 12, 1996 Amendment to October 28, 1994 Settlement Agreement; (iii) the fraudulent August 12, 1996 Amendment, and other documents purporting to grant WWE licensing rights executed by Gonzalez subsequent to his termination by WWE.

113.    In addition and/or in the alternative, Gonzalez represented such contracts to be true knowing them to have been fraudulently made and/or materially altered.

114.    Gonzalez, without authorization or permission from WWE, forged the August 12, 1996 Amendment by, *inter alia,* purporting to grant Ezrique and/or Blue Belt irrevocable, exclusive rights to sell and distribute WWE home videos in the Middle East through June 12, 2011.

115.    Gonzalez, without authorization or permission from WWE, forged various contracts purporting to grant Ezrique and/or Blue Blue WWE licensing rights subsequent to his termination by WWE.

116.    As a direct and proximate result of Gonzalez's unlawful conduct described herein, WWE has been injured, including, *inter alia,* (i) loss of control over its valuable licensing rights; (ii) lost revenues from the sale of WWE home videos in the Middle East; (iii) loss of

various third-party business relationships; (iv) substantial litigation expenses necessitated to attempt to enforce WWE's legal rights; and (v) injury to its business, reputation and goodwill.

## FOURTH CLAIM FOR RELIEF

### FRAUD
**(Against Gonzalez)**

117.    Each of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

118.    Gonzalez's forgery and/or falsification of contracts purporting to grant Ezrique and/or Blue Belt WWE licensing rights, including, but not limited to: (i) the fraudulent August 12, 1996 Amendment; (ii) the fraudulent June 12, 1996 Amendment to Exclusive Agreements; (iii) the fraudulent Amendment to October 28, 1994 Settlement Agreement; and other contracts executed subsequent to his termination by WWE, deliberately misrepresented the scope of licensing rights that had been granted by WWE to Ezrique and/or Blue Belt.

119.    Gonzalez entered into an agreement and/or conspiracy with Blue Belt and/or Ezrique to defraud WWE of its valuable licensing rights.

120.    Gonzalez's misrepresentation of the scope of Ezrique and/or Blue Belt's licensing rights was false and was known to be false and the time it was made.

121.    Gonzalez's misrepresentation of the scope of Ezrique and/or Blue Belt's licensing rights was intended to defraud WWE of its valuable licensing rights.

122.    As a direct and proximate result of Gonzalez's deliberate misrepresentation of the scope of Ezrique and/or Blue Belt's licensing rights, Ezrique and Blue Belt have asserted claims against WWE to licensing rights to which they are not entitled.

123.     WWE, Middle Eastern governments and Middle East businesses were induced to act upon Gonzalez's intentional misrepresentations and they justifiably relied upon the them.

124.     As a direct and proximate result of Gonzalez's unlawful conduct described herein, WWE has been injured, including, *inter alia,* (i) loss of control over its valuable licensing rights; (ii) lost revenues from the sale of WWE home videos in the Middle East; (iii) loss of various third-party business relationships; (iv) substantial litigation expenses necessitated to attempt to enforce WWE's legal rights; and (v) injury to its business, reputation and goodwill.

## FIFTH CLAIM FOR RELIEF

### VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT ("CUTPA"), Connecticut General Statutes §§ 42-110b et seq. (Against all Defendants)

125.     Each of the foregoing allegations is incorporated herein by referenced and reasserted as though fully set forth at length.

126.     The Defendants have engaged in unfair and/or deceptive acts or practices in the conduct of trade or commerce, as defined in Section 42-110a(4) of the Connecticut General Statutes.

127.     The Defendants' acts or practices constitute unfair methods of competition and unfair and deceptive acts and practices in the conduct of trade or commerce in violation of Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a et seq.

128.     The Defendants' unfair and/or deceptive acts or practices offend public policy and are immoral, unethical, oppressive and/or unscrupulous.

129.     As a direct and proximate result of the Defendants' unlawful conduct described herein, WWE has been injured, including, *inter alia,* (i) loss of control over its

valuable licensing rights; (ii) lost revenues from the sale of WWE home videos in the Middle East; (iii) loss of various third-party business relationships; (iv) substantial litigation expenses necessitated to attempt to enforce WWE's legal rights; and (v) injury to its business, reputation and goodwill.

130.    A copy of this Second Amended Complaint has been forwarded to the Connecticut Attorney General pursuant to Conn. Gen. Stat. § 42-110g(c).

## SIXTH CLAIM FOR RELIEF

### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
**(Against Gonzalez)**

131.    Each of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

132.    WWE maintains valid contracts with various third-party business partners in the Territory, including, *inter alia,* Sanjay Video.

133.    Gonzalez had knowledge of those valid contracts with various third-party business partners in the Territory, including, *inter alia,* Sanjay Video.

134.    By his conduct as set forth herein, Gonzalez has intentionally interfered with such third-parties' performance of their contracts with WWE and/or sought to induce such third-parties to cease their performance under their contracts with WWE, to terminate their contracts with WWE or to render the third-parties' performance under their contracts with WWE impossible.

135.    In interfering with such third-parties' performance of their contracts with WWE and/or seeking to induce such third-parties to cease their performance under their contracts with WWE, to terminate their contracts with WWE or to render the third-parties'

performance of their obligations under their contracts with WWE impossible, Gonzalez has acted with malicious purpose and/or dishonest, unfair or improper means to harm WWE.

136.    In interfering with such third-parties' contracts with WWE and/or seeking to induce such third-parties to cease their performance of their contracts with WWE, to terminate their contracts with WWE or to render the third-parties' performance of their contractual obligations under their contracts with WWE impossible, Gonzalez has used, *inter alia,* the tortious conduct and false representations alleged herein.

137.    As a direct result of the Gonzalez's conduct, various third-parties, including, *inter alia,* Sanjay Video, have ceased their performance under their contracts with WWE, have terminated their contracts with WWE or have been unable to perform under their contracts with WWE.

138.    As a direct and proximate result of the Gonzalez's unlawful conduct described herein, WWE has been injured, including, *inter alia,* (i) loss of control over its valuable licensing rights; (ii) lost revenues from the sale of WWE home videos in the Middle East; (iii) loss of various third-party business relationships; (iv) substantial litigation expenses necessitated to attempt to enforce WWE's legal rights; and (v) injury to its business, reputation and goodwill.

## SEVENTH CLAIM FOR RELIEF

## TORTIOUS INTERFERENCE WITH BUSINESS EXPECTENCIES
### (Against Gonzalez)

139.    Each of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

140.    WWE maintains business relationships with various third-party business partners in the Territory, including, *inter alia,* Sanjay Video, Adnan Al Raisi Video and numerous distributors and vendors of WWE home videos.

141.    Gonzalez had knowledge of those business relationships with various third-party business partners in the Territory and the likelihood of future business expectancies with these partners, including, *inter alia,* Sanjay Video, Adnan Al Raisi Video and numerous other distributors and vendors of WWE home videos.

142.    By his conduct as set forth herein, Gonzalez has intentionally interfered with WWE's business relationships with such third-parties.

143.    By interfering with WWE's business relationships with such third-parties, Gonzalez has acted with malicious purpose and/or dishonest, unfair or improper means to harm WWE.

144.    By interfering with WWE's business relationships with such third-parties, Gonzalez has used, *inter alia,* the tortious conduct and/or fraud, misrepresentation and intimidation alleged herein.

145.    As a direct and proximate result of the Gonzalez's unlawful conduct described herein, WWE has been injured, including, *inter alia,* (i) loss of control over its valuable licensing rights; (ii) lost revenues from the sale of WWE home videos in the Middle East; (iii) loss of various third-party business relationships; (iv) substantial litigation expenses necessitated to attempt to enforce WWE's legal rights; and (v) injury to its business, reputation and goodwill.

## EIGHTH CLAIM FOR RELIEF

## FRAUDULENT MISREPRESENTATION
### (Against Gonzalez)

146.    Each of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

147.    Gonzalez made false and misleading statements of fact, as set forth herein, including, *inter alia,* the following:

> a.    Gonzalez, without authorization or permission from WWE, forged the August 12, 1996 Amendment purporting to give Blue Belt irrevocable, exclusive rights to distribute and sell WWE home videos in the Middle East through June 12, 2011.

> b.    On or about October 14, 2002, Gonzalez executed the Gonzalez Affidavit, which contained, *inter alia,* the following false and/or misleading statements: (1) Gonzalez "was the only [WWE] official authorized to issue such exclusive license [sic];" (2) "Such agreement remains in force through June 12, 2011, therefore no present or future official of Titan Sports, Inc. can legally issue an exclusive license for Titan Sports products in the Arabic speaking countries and the Far East within the above reference [sic] period (through June 12, 2011);" and (3) "Accordingly, no party other than Adnan Ezrique can presently have legal claim to an exclusive sole agency or license for Titan Sports Productions in the Arabic speaking countries and the Far East."

148.    Gonzalez's false and misleading statements, as set forth herein, were false and known to be false by Gonzalez.

149.    Gonzalez made the foregoing false and misleading statements with the purpose of inducing others to rely and act upon them.

150.    Gonzalez's false and misleading statements were relied upon to WWE's injury and detriment.

151.    As a direct and proximate result of Gonzalez's unlawful conduct described herein, WWE has been injured, including, *inter alia,* (i) loss of control over its valuable licensing

rights; (ii) lost revenues from the sale of WWE home videos in the Middle East; (iii) loss of various third-party business relationships; (iv) substantial litigation expenses necessitated to attempt to enforce WWE's legal rights; and (v) injury to its business, reputation and goodwill.

## NINTH CLAIM FOR RELIEF

### CONSPIRACY
**(Against All Defendants)**

152.    Each of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

153.    WWE maintains valid contracts and business relations with various third-party business partners in the Territory, including, *inter alia,* Sanjay Video.

154.    Upon information and belief, the Defendants had knowledge of those valid contracts and business relations with various third-party business partners in the Territory, including, *inter alia,* Sanjay Video.

155.    The Defendants, Blue Belt and Ezrique entered into an agreement to unlawfully interfere with WWE's valid contracts and business relations with third-party business partners in the Territory and to interfere with WWE's ability to sell home videos in the Middle East using false representations and other deceptions.

156.    By the conduct as set forth herein, the Defendants, Blue Belt and Ezrique have intentionally interfered by unlawful means with such third-parties' contracts and business relations with WWE and/or sought to induce such third-parties to cease their performance under their contracts with WWE, to terminate their contracts with WWE or to render the third-parties' performance under their contracts with WWE impossible.

157.    The Defendants intentionally committed multiple overt acts in furtherance of the agreement as set forth herein, including, *inter alia*, (i) soliciting and receiving payments

from Ezrique and/or Blue Belt; (ii) executing the August 12, 1996 Amendment; (iii) executing the false Gonzalez Affidavit; and (iv) fraud.

158.    As a direct and proximate result of the Defendants' unlawful conduct described herein, WWE has been injured, including, *inter alia,* (i) loss of control over its valuable licensing rights; (ii) lost revenues from the sale of WWE home videos in the Middle East; (iii) loss of various third-party business relationships; (iv) substantial litigation expenses necessitated to attempt to enforce WWE's legal rights; and (v) injury to its business, reputation and goodwill.

## TENTH CLAIM FOR RELIEF

## PIERCING THE CORPORATE VEIL/ALTER EGO
### (Against All Defendants)

159.    Each of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

160.    Upon information and belief, Gonzalez exercised complete domination of LWI and Eurodalmer with respect to the formation and the operation of LWI and Eurodalmer.

161.    LWI and Eurodalmer were used to perpetuate and implement a conspiracy to defraud WWE, specifically to be a conduit for illegal payments from Ezrique to Gonzalez made in exchange for Gonzalez signing backdated fraudulent contracts.

162.    Gonzalez used the companies as his alter-ego by, among other things, commingling the illegal payments from Ezrique and/or Blue Belt in the accounts of the corporations, disregarded any corporate formalities and then used the illegal payments for his personal purposes.

163.    As a result, any and all liability of LWI and Eurodalmer to WWE should be imposed upon Gonzalez.

39

## ELEVENTH CLAIM FOR RELIEF

### BREACH OF CONTRACT
**(Against Gonzalez)**

164.    Each of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

165.    The acts of:

a.    acting as Eurodalmer's Vice-President without the knowledge and consent of WWE;

b.    soliciting and receiving payments from Ezrique and/or Blue Belt in exchange for granting exclusive WWE licensing rights to Blue Belt; and

c.    actively concealing this conduct from WWE, violate the provisions of the Conduct Agreement.

166.    As a result of the aforementioned conduct, Gonzalez violated the following Paragraphs of the Conduct Agreement: a, c and i.

167.    WWE fully performed all of its obligations under the Conduct Agreement.

168.    As a result of the foregoing breaches by Gonzalez, WWE has been damaged and continues to suffer damages.

## TWELFTH COUNT

### BREACH OF FIDUCIARY DUTY
**(Against Gonzalez)**

169.    Each of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

170.    Gonzalez had a superior skill, knowledge and expertise in the licensing business as WWE's Senior Vice-President of Worldwide Properties.

171.    WWE placed a unique degree of trust and confidence in Gonzalez.

40

172.     As a result of Gonzalez's superior skill, knowledge and expertise and WWE's unique degree of trust and confidence in Gonzalez, Gonzalez owed a fiduciary duty to WWE.

173.     Because Gonzalez owed a fiduciary duty to WWE, Gonzalez had a duty to act with loyalty and honestly toward WWE.  Gonzalez also had a duty not to engage in self-dealing or act with a conflict, or appearance of conflict of interest.

174.     By engaging in wrongful conduct, including:

   a.  acting as Eurodalmer's Vice-President without the knowledge and consent of WWE;

   b.  soliciting and receiving payments from Ezrique and/or Blue Belt in exchange for granting exclusive WWE licensing rights to Blue Belt; and

   c.  actively concealing this conduct from WWE, Gonzalez engaged in self-dealing and acted with a conflict of interest due to his position as Senior Vice-President of Worldwide Properties.

175.     Gonzalez, having signed the Conduct Agreement, was fully aware that WWE would strongly disapprove of this conduct.  As a result, Gonzalez also acted with extreme disloyalty toward WWE.

176.     As a result of Gonzalez's self-dealing, conflict of interest and disloyalty toward WWE, Gonzalez breached the fiduciary duties he owed to WWE.

177.     As a result of the foregoing breaches by Gonzalez, WWE has been damaged and continues to suffer damages.

## PRAYER FOR RELIEF

WHEREFORE, WWE respectfully requests that the Court award it the following relief:

a. permanent injunctive relief enjoining Gonzalez from further interfering, directly or indirectly, with WWE's third-party business relationships;

b. compensatory damages in excess of $75,000.00;

c. double damages as permitted by Conn. Gen. Stat. § 52-565;

d. punitive and CUTPA damages;

e. treble damages as permitted under RICO, 18 U.S.C. § 1964(C);

f. WWE's costs and expenses, including attorneys' fees, incurred in this action; and

g. any other relief that the Court may deem appropriate.

PLAINTIFF, WORLD WRESTLING
ENTERTAINMENT, INC.


By: _____
Stanley A. Twardy, Jr., Esq. (ct05096)
Terence J. Gallagher, Esq. (ct22415)
DAY, BERRY & HOWARD LLP
One Canterbury Green
Stamford, CT  06901-2047
(203) 977-7300 (phone)
(203) 977-7301 (fax)

and

Jerry S. McDevitt, Esq.
Jason L. Richey, Esq.
Amy L. Barrette, Esq.
KIRKPATRICK & LOCKHART LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA  15222

Its attorneys.